**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

MARK LOVELL,

      Plaintiff,

    v.

CLERMONT COUNTY SHERIFF'S OFFICE, et al.,

      Defendants.

Case No. 1:23-cv-114

Bowman, M.J.

**MEMORANDUM OPINION AND ORDER**

Plaintiff Mark Lovell filed suit under 42 U.S.C. § 1983 based on events that occurred following his arrest. Plaintiff alleges that after he was taken into custody, six Clermont County Sheriff's Officers subjected him to excessive force, causing serious injuries. Plaintiff further alleges that following that use of force, seven individuals exhibited deliberate indifference to his serious medical needs and denied him adequate medical care. Two groups of defendants have separately moved for summary judgment. For the reasons discussed, the motion of the six Clermont County Officers is partially denied on two claims of excessive force. Apart from those two claims, however, the two motions for summary judgment are granted.

**I.     Identification of the Parties**

Plaintiff filed an amended complaint on February 25, 2023 that asserts ten separate claims against seven individuals and three entities. The amended complaint identifies the following Defendants: Clermont County Sheriff Leahy, the Clermont County Board of Commissioners ("the Board"), Officer Joseph Bailey ("Bailey"), Officer Eric Mullenix ("Mullenix"), Corporal Gregory Paff ("Paff"), Officer Dylan Pemberton

("Pemberton"), Officer Alex Tincher ("Tincher"), Officer Terra Shouse ("Shouse"), Nurse Samantha Irwin ("Irwin"), and Southern Health Partners ("SHP"). All individual Defendants are named in both their individual and official capacities.

For the Court's convenience, the six individual Clermont County Officers (Bailey, Mullenix, Paff, Pemberton, Tincher and Shouse) are collectively referred to as "Defendant Officers." In addition, the Defendant Officers, the Board, newly elected Clermont County Sheriff Stratton in his official capacity,[1] and former Sheriff Leahy in his individual capacity, are collectively referred to as the "County Defendants."

## II.    Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden of production, the nonmoving party cannot rest on the pleadings, but must present significant probative evidence in support of his case to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248-49.

---

[1] The amended complaint names only Sheriff Robert Leahy. On January 6, 2025, Christopher Stratton became the newly elected Sheriff of Clermont County. To the extent that Plaintiff has named Sheriff Leahy in his official capacity, Sheriff Stratton is properly substituted as the duly elected Clermont County Sheriff.

2

The mere scintilla of evidence to support the nonmoving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the nonmoving party. *Id.* at 252.

Rule 56(c) sets forth the procedures for supporting factual positions. Pursuant to Rule 56(c)(1), a party must support his assertion that a fact cannot be or is genuinely disputed by:

> (A)    citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B)    showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

*Id.* Evidence submitted in support of summary judgment need not only consist of admissible evidence, so long as the evidence could be presented in a form that would be admissible at trial. When a party has failed to properly support or address a fact as required, the court may provide an additional opportunity to support or address the fact, or may consider the fact to be undisputed. *See* Rule 56(e).

"To the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed in the light depicted by the videos." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see also Feagin v. Mansfield Police Dept.*, 155 F.4th 595 (6th Cir. 2025). But where the video is ambiguous, the court must "fill in the blanks by considering disputed evidence in a light most favorable to [the plaintiff], completing the story with any uncontested factual assertions the officers proffer." *Feagin*, 155 F.4th at 601 (additional citation omitted).

3

### III.    Findings of Fact Construed in Plaintiff's Favor[2]

**Lovell's Arrest by Williamsburg Police Officers**

On Saturday, February 27, 2021, Mark Lovell ("Lovell") went to Ruby Lyon's Hideaway where he consumed an excessive amount of alcohol. Eventually, he left Ruby Lynn's Hideaway and was dropped off at the Double E bar in Williamsburg, Ohio. Just before midnight, a group of individuals in front of the Double E bar flagged down Officer Neumeier of the Williamsburg Police Department regarding a disorderly intoxicated male. Officer Neumeier observed Lovell staggering and slurring his speech. Neumeier further observed several individuals attempting to calm Lovell down and holding on to him to keep him from falling. (Doc 58-1, Undisputed Findings 1-8.)

Neumeier's police report includes a statement by an employee at the Double E, Dan Dickson, that Dickson wanted Lovell to leave the bar. Dickson reported that Lovell was making sexual comments to females and other statements to patrons about physical harm, but that no physical altercation had occurred and no one wanted to press charges. (Doc. 58-1, Findings 9-11; 14; Doc. 58-3, PageID 1305.) Lovell had some "scabbed over" abrasions on his face at the time. (Doc. 58-3, PageID 1305.)

When Neumeier attempted to handcuff Lovell, he resisted. So Williamsburg Officer Jason Flynn, who had arrived to assist, wrapped his arms around Lovell while Neumeier finished handcuffing him. When they placed Lovell into a police vehicle, he spat. Lovell

---

[2]Both groups of Defendants filed statements of "Proposed Undisputed Facts," supported by appropriate citations to the record. (*See* Docs. 58-1, 66.) Many Findings are derived from facts that either are unconditionally admitted by Plaintiff, or as to which Defendants have met their burden of production and Plaintiff has failed to cite to any contrary evidence. (*See e.g*, Doc. 81-1, ¶¶ 20-22, "Admits that the cited evidence suggests this is true.") Where expressly noted, the Court has made additional findings based on video evidence.

disputes the extent to which he resisted arrest and whether he intended to spit on Officer Neumeier's pantleg.[3] (Doc. 58-1, Findings 19-21, 23.)

Once inside the cruiser, Lovell kicked the divider and inside the door, ignoring instructions to stop. When Williamsburg Officers opened the door, Lovell placed his knee against it, causing the door to hit his knee as the officers closed it. At one point, Lovell swung both feet outside and Officer Flynn reached through the opposite side of the cruiser and pulled Lovell back by the shoulders. (Doc 58-1, Findings 24-25, 27-28.)

Flynn contacted Lovell's family. Lovell's daughter expressed concern that Lovell not be returned home because he could be violent when intoxicated. Lovell's wife stated that she wanted him to sober up and cool off in a holding cell. (Doc. 58-1, Findings 31-32.) After citing Lovell for two misdemeanors and based on the family's wishes, Neumeier transported Lovell to the Clermont County Jail. En route, Lovell verbally threatened Neumeier and his family. Based on those threats, Neumeier charged Lovell with a third misdemeanor offense, aggravated menacing.[4] (*See* Doc. 58-1, Findings 33-34; Doc. 58-3, PageID 1309.) Neumeier also alerted Clermont County Dispatch, also known as the Communications Center, to request assistance upon arrival. The Communications Center relayed that request to the Jail. (Doc. 58-1, findings 36-39.)

**Lovell Arrives at the Clermont County Jail**

Defendant Officers Pemberton, Bailey, Mullenix and Paff were waiting to assist when Lovell arrived at the Jail at approximately 12:25 a.m. on February 28, 2021. Sgt.

---

[3]An Incident Report completed by Officer Flynn reports that Lovell told him that "he did not mean to [spit] that he just spits when he talks…." (Doc. 58-3, PageID 1308.) No video evidence of the arrest was submitted by either party.
[4]The menacing offense initially was mistakenly identified as a felony, (Doc. 58-5, PageID 1328), but was later corrected to a misdemeanor 1 offense.

Newsome – who is not a defendant in this case - operated a handheld camera. The video depicts Lovell's slurred speech and some unsteadiness. (Doc 58-1, Findings 40-43.) Multiple Officers surrounded him with Bailey taking hold of Plaintiff's right arm.

The video also reflects Lovell's verbal belligerence but physical compliance during an initial pat down search just outside the booking area. As he walks into the booking area, Lovell is only slightly unsteady. (*See* Plaintiff's Ex. 39, DeBord Video 1, 0:50-2:12; Plaintiff's Ex. 25, Clermont Video 02-119, 0:01-1:32). He complies with a second pat down and removal of his wedding ring and shoes. (DeBord Video 1, 2:12-2:28.) During this time, he complains almost continuously about Officer Bailey's grip on his right arm but does not verbalize other pain complaints. (*Id.*, 2:28-4:40.)

### Arrival of Nurse Irwin and First Use of Force

Defendant Southern Health Partners ("SHP") provides medical care at the Jail. Officers summoned Defendant Nurse Irwin, a Licensed Practical Nurse employed by SHP, to assess Lovell. Irwin took his temperature without incident. Throughout her evaluation, Lovell continually voices his displeasure with Bailey's grip. Mullenix warns that he will put Lovell in "the chair" if he does not "chill." (DeBord Video 1, 4:40-5:23.)

When Irwin attempts to place a pulse oximeter on Lovell's right finger - the arm held by Bailey - Lovell momentarily jerks his hand away and tenses his right fist, though Bailey maintains his grip. (*Id.*, 5:00-5:20.) Without skipping a beat or encountering resistance from Lovell, Irwin deftly places her instrument on Lovell's left hand, stating calmly, "just do this one, you're fine, you're fine." (*Id.*) As Irwin takes her reading, Officers on Lovell's right side order him to relax and/or loosen his right hand. (*Id.*, 5:13-5:24.) Paff appears to move closer to Lovell's right hand. (*Id.*) Seconds later, Irwin removes the pulse

6

oximeter and Officers walk Lovell toward a restraint chair. At that time, Plaintiff's right hand appears to be straightened rather than clenched as he walks uncuffed, still firmly in the Officers' grip. (*Id.*, 5:23-5:28.)

During the short walk, Defendant Officers allege that Lovell attempted to pull away. (Doc. 58-1, Finding 52.) Plaintiff disputes the Officers' account based on video evidence. What is undisputed is that Paff uses his leg to trip Lovell and take him to the ground.

In support of their version of events, Defendants rely heavily on unsworn statements collected in a Response to Resistance ("RTR") report completed on March 1, 2021. (Doc. 58-7) Plaintiff denies any active resistance at the time of Paff's takedown or at any other time. (*See* DeBord Video. 1, at 5:28-5:35; Doc. 81-1, PageID 2578, Disputed Issue of Fact 11.) Based on conflicts between the RTR report and video evidence, a genuine issue of material fact remains as to whether Lovell pulled away prior to Paff's takedown.

At the end of his takedown, Paff punches Lovell in the shoulder and Tincher reaches for his cannister of pepper spray ("OC spray"). Bailey retains his grip on Plaintiff's right arm, while Mullenix retains a grip on his left arm. (DeBord Video 2; *see also* Doc. 81-3, Ex. 2 (still image); Doc. 81-3, Ex. 3 (still image).)) Lovell lands in a prone, face down position. After he lands, Defendants assert that Lovell tucked one arm under his body and disobeyed commands to give it up. (Doc. 58-1, Finding 53.) But the video record appears to contradict that account. In video records, five Officers appear to control Plaintiff as he reaches the floor. Tincher kneels next to Lovell's left shoulder and uses his right hand to pin his neck to the floor as he holds his OC canister with his left hand. Bailey has his left knee on Plaintiff's back and Lovell's right arm remains secured with both of Bailey's

hands, pulled at a 90-degree angle from his body. Mullenix is to the left of Lovell's midsection, holding onto Lovell's left arm. (Clermont Video 2-169 (Ex. 26) at 4:51; Doc. 81-3, Ex. 3, (still image). After Lovell hits the floor, Tincher yells "OC," alerting the other Officers, before deploying OC spray directly towards Lovell's face. Plaintiff alleges that shortly thereafter, Tincher rubs the OC gel onto Lovell's face. (Doc. 81-3, Ex. 7 (still image.)) As he lies relatively motionless, Lovell is pinned and secured by multiple Officers. Neither of Plaintiff's arms appears to be beneath his torso. (Doc. 81-3, Ex. 6 (still image); *see also, generally*, Doc. 81-1, Response to Finding 54, PageID 2567.)

Over no more than 20 seconds,[5] Officers deploy "tactical strikes" including closed fist punches. Despite the absence of visual evidence of resistance, the video captures multiple audio commands to Lovell to "stop resisting" and to "give us your hands." (DeBord Video 1 5:42-5:51.) At this point, blood pools under Lovell's face. Defendant Shouse approaches from behind the booking counter and places a spit bag over Lovell's head; blood soaks through and is visible on the exterior of the bag. (DeBord Video 1, at 5:57-6:04.) Officers reapply handcuffs.

Defendant Officers stand Lovell back up and place him into the restraint chair at approximately 12:31 a.m. Nurse Irwin checks his six restraint points at 12:33 a.m. She returns to check his blood pressure. Lovell states: "I need my eyes screened." Paff replies: "No, you need to start listening before you come out of that chair and get that stuff taken care of man." Lovell mumbles incoherently, and Paff states: "if you aren't going to listen to me, I'm damn sure not going to listen to you." Irwin declines Lovell's request to rinse his eyes, stating, "No, I can't do that, hon," while she finishes taking his blood pressure.

---

[5]Defendants maintain that the tactical strikes lasted no more than 14 seconds. (Doc. 58, PageID 1237.)

(DeBord Video 1, 8:41-9:30.) Lovell groans, "Ow, my eyes, bad." Lovell is placed in Booking Cell 304, still in the restraint chair and wearing the spit bag. (DeBord Video 1 at 9:35-9:45 and 10:10-10:26; Doc. 58-1, Finding 55-56; Clermont Video 2-169, 6:40-6:57.)

Defendants offer uncontradicted testimony that Officers observed Lovell every ten minutes and that Irwin checked on him every thirty (30) minutes and reported no signs of distress.[6] (Doc. 50, PageID 983-984; *see also* Irwin Affidavit, Doc. 57-3.) Defendants' observations were recorded in an Increased Observation Log and in a Booking Log. (*Id*., PageID 985; *see also* Doc. 46-4.)

### Second Use of Force

At approximately 2:26 a.m., Lovell was removed from Booking Cell 304 and wheeled to the shower room for decontamination. (Doc. 58-1, PageID 1279, Finding 59.) Approximately five minutes later following a second use of force, Lovell is returned to the restraint chair. Nearly all facts concerning the second use of force are disputed.[7]

When first removed from the cell, Lovell was unresponsive and needed to be roused twice by sternum rubs. Officers ask Lovell if he is "going to comply with everything" if released and if he is ready to "get that stuff out of your eyes," with a fresh change of clothes. (DeBord Video 2, 0:03-1:10.) Paff wheels Plaintiff in the restraint chair towards the shower room, accompanied by Bailey and Pemberton. Newsome follows with a camera. (DeBord Video 2 at 1:11-2:10.) Mullenix and Shouse join en route. Before joining,

---

[6]Plaintiff objects to this testimony on the basis that it is not in a form that could be admitted into evidence. But Paff and Irwin can testify to their own observations. The objection is also overruled because the logs appear to be contemporaneous business records that could be authenticated at trial. (Doc. 46-4). Plaintiff further objects that no corroborative videos of the 10 and 30-minute checks were produced despite Plaintiff ostensibly requesting "all" relevant videos. (Doc. 81-1, PageID 2568.) This objection is overruled both because the referenced requests for "all" relevant documents or videos are so broadly worded as to be vague, and because Plaintiff did not previously object to the Defendants' responses.

[7]All disputed facts are again construed in Plaintiff's favor where the video record supports Plaintiff's construction, or alternatively, where the video record is ambiguous.

Shouse grabs a pair of latex gloves and a fresh spit hood. (Clermont Video 3-117, 1:14-1:22.)

In the hallway adjacent to the shower room, Lovell requires assistance from Defendants Paff and Bailey to stand up and walks with obvious difficulty. Paff states, "Legs hurt? I gotcha." (DeBord Video 2 (Ex. 40 at 2:00-2:28; Doc. 81-3, Ex. 14 (still image.) Bailey and Paff place Lovell on a bench inside the shower room. (DeBord Video 2, 1:32-2:45.) Mullenix enters. Pemberton remains in the doorway and Newsome and Shouse remain in the hallway. (DeBord Video 2, 2:29-2:45.) The door to the shower room partially closes, and the camara view is blocked by Pemberton's body in the door frame. (DeBord Video 2, 2:30-3:50.)

Officers remove Plaintiff's spit hood and Bailey and Paff tell Lovell they are going to remove his shirt. Lovell disagrees with a comment that they are trying to help him, protesting that the officers rolled his leg and asking "you gotta have ten sheriffs?" Bailey suggests removing Lovell's pants so he can get into the shower; Lovell mumbles "What the hell for?" (DeBord Video 2, 3:25-3:41.) An Officer states: "That's why we have ten guys," (*Id*., 3:43-3:45). Around that time, the door closes as Pemberton steps fully into the shower room. Sgt. Newsome remains in the hallway, recording the closed door for roughly eleven seconds. (*Id*., 3:41-4:03; Clermont Video 4 (Ex. 30), 1:42-2:36.) During that time, the parties' voices are heard in brief phrases, including "That's right boy" and "Who the fuck you calling a boy?" A commotion ensues and Newsome and Shouse run toward the door. (DeBord Video 2, 3:42-4:04; Clermont Video 4, 2:36-2:47.)

As Newsome opens the door, the video shows Lovell sitting hunched over on the bench in a defensive position, his hands covering his face. (Doc. 81-3, Ex. 15 (still image

DeBord Video 2 at 4:04).) Paff, Pemberton, Bailey and Mullenix surround him and are punching him. Newsome begins yelling "stop resisting," and others repeat the command. (DeBord Video 2, 4:04-4:07; Clermont Video 4, 2:47-2:55.) Multiple Officers grab Lovell's right arm and pull him from the bench, while Lovell's left hand remains in front of his face. Bailey places his right arm between Lovell's legs, lifts him from the ground by his waist in an action that raises Lovell's body and then drops him to the floor. (DeBord Video 2, 4:08-4:10; Doc. 81-3, Ex. 17 (still image).) Bailey's action causes Paff to lose his grip, and Bailey, Pemberton, and Mullenix fall to the floor with Lovell.

Lovell lands on his stomach, with both hands shielding the back of his neck (DeBord Video 2, 4:23; Doc. 81-3, Ex. 18 at PageID 2625). Pemberton appears to be grasping both of Lovell's forearms (*Id.*) But the camera view of most of Lovell's body is obstructed by the Officers' bodies. The Officers deliver dozens of punches and other "tactical strikes," including blows to Plaintiff's shoulder or head, his torso, and legs.[8] (DeBord Video 2, 4:10-4:22.) Paff deploys OC spray to Lovell's face at point-blank range and Shouse announces she has a fresh spit hood. (*Id.*, 4:22-4:25.) Within three seconds of the deployment of OC spray, Officers resume tactical strikes to Lovell's upper body, back, torso, and legs for approximately 45 more seconds. (DeBord Video 2, 4:22-5:07.)

After Lovell is again handcuffed, Shouse hands the clean spit hood to Bailey. (DeBord Video 2, 5:27-5:29.) Shouse and Mullenix exit. Paff, Bailey and Pemberton lift and place Lovell back in the restraint chair. (DeBord Video 2, 5:23-5:43.) Officers return to the booking area, where Nurse Irwin awaits.

---

[8]Plaintiff alleges in his memorandum in opposition that Defendants administered 39 punches or strikes, and kneed him an additional 11 times.

Irwin again checks Lovell's restraints before he is returned to Booking Cell 304. (DeBord Video 2, 8:40-9:07.) Increased Observation and Booking logs again reflect visual checks by Officers every ten minutes and by Irwin every thirty minutes. (Doc. 50.)

**Events Relating to Medical Care Following the Second Use of Force**

Lovell was next released from the restraint chair around 4:30 am,[9] when Paff wheeled him to the shower room a second time accompanied by Mullenix and Pemberton. (Doc. 58-1, Finding 68-69.) Newsome again follows with a camera and Shouse joins the group. (DeBord Video 3, 0:08-0:24). This time, Mullenix grabs a set of Jail clothing from a supply room. (*Id.*, 0:50-1:25.)

Lovell again requires assistance to stand up. He is shirtless, and his back is red. (DeBord Video 3, 1:30-1:49; Doc. 81-3, Ex. 19 (still image.)) Lovell declines the offer of a shower or decontamination and states he just wants to get dressed. (DeBord Video 3, 5:20-9:46; Clermont Video 7 (Ex. 37) at 1:15-1:36 and 7:35-9:33.) Mullenix exits the shower room briefly to retrieve a towel. Newsome holds the door open as Mullenix reenters. (DeBord Video 3, 2:06-2:25.)

Lovell touches his mouth; Paff asks "Y'all right?" Lovell points to his teeth and Paff responds, "gotcha, I'll have the nurse check ya'. I'll have the nurse check ya' here in a second. (DeBord Video 3, 2:25-2:38.) As Lovell prepares to remove his pants, he touches his left lower back area and states: "They beat me man, they got me good. I guess this is what they wanted to do." Lovell pauses and Officers ask if he needs help to stand. Plaintiff

---

[9]In their respective Proposed Undisputed Facts, the Clermont County Defendants pinpoint the time as 4:25 a.m. (Doc. 58-1, ¶ 68), while the SHP Defendants pinpoint the time as 4:34 a.m. (Doc. 62, ¶ 26). Plaintiff "admits" both proposed findings.

responds, "Man, I can't move" and complains: "These mother fuckers beat me up man," and "They got me good." (DeBord Video 3, 3:30-4:00.) Paff states, "I gotcha." (*Id.*)

Paff supports Lovell as he stands up. Lovell remains hunched over, and continues to make comments about being "fucked up." Lovell pulls down his pants, revealing a pain patch on his knee; Paff assures him they will inform the nurse. (DeBord Video 3, 4:25-4:52.) Lovell changes with help. He requires assistance to walk as he exits the room, which Paff and Pemberton provide. Lovell appears to be limping and is bent at the waist. He comments: "They hurt me bad," and "I think I need to see somebody right now." Officers reassure him that the nurse will check him. (DeBord Video 3, 7:36-7:46.) Paff directs Mullenix to retrieve a wheelchair. (*Id.*, 7:46-8:15.)

Before Lovell reaches the wheelchair, Irwin walks over and assesses his prior restraint points. Lovell complains: "It's not my knee, it's my upper body." Irwin responds: "I just need to check your ankles hon." Paff advises her that Lovell complained "his ribs hurt" and of the discovery of the pain patch and Irwin briefly asks about the pain patch. Despite being informed of Lovell's rib pain, the video does not show further examination by Irwin of Plaintiff's upper body, contrary to her affidavit testimony.[10] (DeBord Video 3, 8:15-9:44.) As the Officers place him in the wheelchair, Lovell groans and says: "These fools fucked me up bad." Paff advises him that the Officers are going to get him into a bed so he can lay down the rest of the night. (*Id.*, 9:30-9:44.)

---

[10]Irwin's affidavit attests that she performed a more complete examination at 4:34 a.m., including "an abdominal assessment and palpat[ing] the areas where he complained of pain," but "found no bruising, redness, swelling, or any indication of an external or internal injury." (Doc. 57-3, PageID 1050.) Based on video evidence at that time, and for purposes of the pending motion, the Court credits Plaintiff's version of this disputed fact. *See Scott v. Harris*, 550 U.S. at 380.

Paff, Pemberton and Mullenix wheel Lovell to Cell 309, where they assist him out of the wheelchair, into the cell, and onto the bed. As they do so, Lovell moans and exclaims again. (DeBord Video 4, 0:40-0:45.) When Lovell states he is "hurt bad," Paff responds reassuringly and directs Lovell to "let me know if you need anything." (DeBord Video 4, 0:45-1:15.) Lovell questions "Why'd they do that man?" Paff answers, "Well apparently you tried to come at 'em." In response to Lovell's denial, Paff says, "I gotcha." (*Id.*, 1:20-1:42.) Lovell asks for a mat, and the Officers offer "maybe in a little while" after he gets some sleep. Lovell states "They broke my ribs, dude," but the Officers do not directly respond. (*Id.,* 2:42-2:45.)

Nurse Irwin left her shift at 7 a.m. Around 11 a.m., Nurse Sydney Davis conducted a more thorough examination as part of her completion of a "Medical Staff Receiving Screening Form" for new inmates. (Doc. 57-7, PageID 1071-1072.) Based on his complaints, Davis prescribed 800 mg of ibuprofen at 11:30 a.m. and ordered x-rays of Lovell's chest. (*Id.*, PageID 1085.) The x-rays were electronically read and signed at 12:14 p.m. (*Id.*, PageID 1083.) They showed four fractured ribs, flail chest, and a possible pneumothorax. (*Id.*, PageID 1085.)

Sgt. Hundley was notified at 1:37 pm that Lovell required transport. Lovell was transported to Clermont Mercy Hospital at 2 p.m. on February 28, 2021, where he received a CT scan. (Doc. 58-1, Findings 74-76.) He was transferred on the same day to the University of Cincinnati Medical Center's Trauma Center ("UCMC"), where he was admitted for monitoring and prescribed pain medications. He remained at UCMC until his discharge back to the Jail on March 3, 2021. *(Id*., Findings 77-78.) He was diagnosed with fractured ribs, pneumothorax, a lacerated spleen, a hip impingement, and mild cognitive-

linguistic defects. (Doc. 57-7, PageID 1087.) Plaintiff was released from the Jail on bond on March 9, 2021.

### IV.    Analysis of Issues Presented in the Pending Motions (Docs. 57-58)

### A. Summary Judgment is Granted on Excessive Force Claims Newly Asserted in Response to Defendants' Motion

The Defendant Officers seek summary judgment on the grounds that none used excessive force while executing takedown maneuvers, tactical strikes, and deploying OC spray in two incidents at the Jail. Plaintiff's complaint describes the two incidents as distinct "attacks," largely defining them by reference to the booking area and shower room locations and the time periods in which they occurred. (See Doc. 23, ¶ 27, 28, 34, 42, 56, 58). The amended complaint uses captions consistent with that spacial and temporal framework, characterizing Count 1 as the "First Act" excessive force claim, and Count 2 as the "Second Act."

In his response to summary judgment, however, Plaintiff more expansively defines "Count 1" as not merely as including the referenced actions, (Doc. 81, PageID 2537, 2539), but as encompassing, as a separate uses of force, "the "refus[al of [Plaintiff's] request that the O.C. spray be rinsed from his eyes and …[leaving] him in the restraint chair with a blood-soaked spit-hood covering his O.C.-drenched face for nearly two hours." (Doc. 81, PageID 2543.) Similarly, Plaintiff's opposing memorandum expands his Count 2 "Second Act" excessive force claim from the "attack" in the shower room, (Doc. 81, PageID 2546), to the Defendant Officers' act of placing him "back in the restraint chair with a blood-soaked spit-hood over his OC-covered face for nearly two more hours." (Doc. 81, PageID 2549.)

In their reply, Defendants protest that Plaintiff's new arguments regarding the amount of time he was confined to the restraint chair, and/or the amount of time he endured wearing a spit hood without decontamination, are brand new excessive force claims for which the amended complaint failed to provide fair notice. (*See* Doc. 69, PageID 1864-1866.) Defendants alternatively argue that they are entitled to qualified immunity because it was not clearly established in February 2021 that it was unreasonable to secure a noncompliant inmate in a restraint chair wearing a spit hood for 2 hours after the use of OC spray and prior to decontamination. (Doc. 69, PageID 1866-1874.) The first argument is persuasive. Therefore, the Court finds no need to address Defendants' alternative argument.

The amended complaint does not allege that the Defendants' use of the spit hood or restraint chair constitutes excessive force. To be clear, Counts 1 and 2 contain little more than a legal conclusion that "[t]he foregoing mentioned acts… constituted an excessive and objectively unreasonable use of force." (Doc. 23, ¶¶ 62, 64). The reader must review the chronological allegations in ¶¶ 1-60 to determine precisely what "foregoing… acts" the Defendant Officers committed.

In contrast to newly asserted claims regarding the spit hood and time in the restraint chair, those sixty paragraphs primarily describe discrete incidents in the booking area and shower room in which two distinct "attacks" occurred that included physical takedowns, tactical strikes, and application of OC spray to Plaintiff's face. (*See id*., ¶ 42.) Although the complaint briefly mentions the time that Plaintiff was left in Cell 304 as 12:36 a.m. and his retrieval at 2:25 a.m., his references to his placement in the restraint chair are cursory at best, and references to OC spray are most easily understood as relating

to Plaintiff's medical care following each incident.[11] (*See id.*, ¶¶ 27-29.) Allegations regarding the shower room incident similarly focus on the Defendant Officers' takedown and use of tactical strikes and OC spray in that location. (Doc. 23, ¶¶ 33-36.) Plaintiff does not mention the use of the spit bag at all. And again, he references being left alone in the restraint chair at 2:34 a.m. and retrieval at 4:24 a.m. in a manner that is reasonably understood to relate more to his deliberate indifference claim rather than to a distinct claim of excessive force. (Doc. 23, ¶¶ 37-40.) In response to summary judgment, however, Plaintiff argues that Defendants' placement of him in a restraint chair for nearly two hours without decontamination on two occasions between the two "attacks" constitutes separate uses of force in violation of the Fourth Amendment.

Plaintiff's significant expansion of his excessive force claims on summary judgment is deeply prejudicial to Defendants, who lacked fair notice based on the allegations of the amended complaint. Defendants therefore are entitled to summary judgment on the newly articulated claims. *See McColman v. St. Clair County*, 479 F. App'x 1, 5-6 (6th Cir. 2012) (granting summary judgment where the plaintiff alleged only that she was handcuffed during the incident, without reference or allegation to the cuffs being overly tight.)

### B. Qualified Immunity and the Relevant Constitutional Right

For claims that are properly asserted against them in their individual capacities, six Defendant Officers assert qualified immunity.[12] Specifically, the Defendant Officers assert

---

[11]As discussed below, however, Plaintiff's response in opposition to summary judgment narrows his deliberate indifference claim to Defendants' failure to provide him with medical care after his alleged serious injuries became more "obvious" around 4:30 a.m.

[12]Nurse Irwin does not assert qualified immunity. *See Harrison v. Ash*, 539 F.3d 510, 524 (6th Cir. 2008) ("[W]e find that the purposes of qualified immunity do not support the extension of the doctrine to nurses employed by a private medical provider.") The doctrine also does not apply to the entity Defendants, and does not preclude claims asserted against Defendants in their official capacities.

qualified immunity for Counts 1 and 2 (excessive force), Counts 3 and 4 (failure to protect against excessive force), Count 7 (inadequate medical care), and Count 8 (failure to protect against inadequate medical care).

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs,* 475 U.S. 335, 343, 341 (1986)). Once an individual defendant has asserted qualified immunity, the burden shifts to the plaintiff to overcome it. "To overcome a defendant's assertion of qualified immunity, a plaintiff must show both (1) that the defendant violated a constitutional right, and (2) that the right was clearly established at the time of the violation." *Downard v. Martin*, 968 F.3d 594, 599-600 (6th Cir. 2020) (citing *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009)).

To discern whether the Defendant Officers violated any constitutional right for purposes of qualified immunity, the Court starts by identifying the constitutional right at issue. In Counts 1 and 2, Plaintiff alleges that six Officers engaged in the excessive use of force that violated his constitutional rights under both the Fourth and Fourteenth Amendments.

The correct constitutional provision for use-of-force claims depends on the plaintiff's status at the time that force was used. Plaintiff was taken into custody on misdemeanor charges without a warrant. In *Colson v. City of Alcoa, Tennessee*, 37 F. 4th

1182 (6th Cir. 2022), the Sixth Circuit confirmed that an excessive force claim brought by an arrestee, prior to any judicial determination of probable cause, arises under the Fourth Amendment alone. The Fourth Amendment specifically prohibits "unreasonable searches and seizures." U.S. Const. Amend. IV.

> For claims concerning injuries sustained while in police custody, there is sometimes a dispute over whether the Fourth or Fourteenth Amendment governs the constitutionality of the officer's conduct. After all, the point at which the Fourth Amendment's prohibition against unreasonable seizures ends and the Fourteenth Amendment's substantive due process right begins is not always obvious. … [I]n *Aldini*, we held that when a person in custody asserts an excessive force claim against an officer, a judicial determination of probable cause is the "dividing line" between application of the two amendments. *Aldini v. Johnson*, 609 F.3d 858, 865-66 (6th Cir. 2010). Under the *Aldini* paradigm, the Fourth Amendment governs an excessive force claim brought by an "arrestee"—one who has been arrested but has not yet received a judicial determination of probable cause, either through an arrest warrant or a post-arrest probable cause hearing. *Id*. at 866.

*Id.*, 37 F.4th at 1187; *see also, generally, Barnes v. Felix*, 605 U.S. 73, 79, 145 S. Ct. 1353, 1357 (2025). Thus, Plaintiff's two excessive force claims arise solely under the Fourth Amendment, and not the Fourteenth.[13]

Aside from the two excessive force claims, Count 7 is the third most central claim to Plaintiff's complaint. There, Plaintiff alleges that the six Defendant Officers and Nurse Irwin exhibited deliberate indifference when they failed to provide him with constitutionally

---

[13]The practical effect of that distinction after *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473, 576 U.S. 389, 396-97 (2015), remains unclear in the Sixth Circuit. Prior to *Kingsley*, the Sixth Circuit suggested that distinctions exist. *See Aldini v. Johnson*, 609 F.3d at 867. Post-*Kingsley* cases cast initially some doubt on that notion. *See Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015) (signaling that post-*Kingsley*, the Fourteenth Amendment "objectively reasonable" test mirrors the Fourth Amendment test); *accord Hopper v. Phil Plummer*, 887 F.2d F.3d 744, 752 (6th Cir. 2018). But in *Chaney-Snell v. Young*, 98 F.4th 699, 719 (6th Cir. 2024), the Sixth Circuit stated that the fact that a "*de minimis* level of imposition" would not violate the Fourteenth Amendment "says little about whether minor force can render a "seizure" "unreasonable" under the Fourth Amendment." (internal citations omitted).

adequate medical care. In contrast to the excessive force claims, Plaintiff's medical care claims arise solely under the Fourteenth Amendment. *See Colson*, 37 F.4th at 1187.

The remaining claims for which the individual Defendant Officers assert qualified immunity are derivative with respect to Plaintiff's excessive force and medical care claims. In Counts 3 and 4, Plaintiff alleges that the individual Defendant Officers are liable for failing to protect him from the uses of force alleged in Counts 1 and 2. Count 8 similarly alleges that individual Defendants failed to protect him from the inadequate medical care set out in Count 7.[14] In *Chaney-Snell v. Young*, 98 F.4th 699 (6th Cir. 2024), the Sixth Circuit discussed whether a constitutional provision like the Fourth Amendment or the Equal Protection Clause supports a failure-to-intervene claim for an excessive use of force, or whether such claims are founded on the text of 42 U.S.C. § 1983 itself. The appellate court acknowledged the lack of clarity. "[W]e have held that an officer who fails to intervene to prevent another officer's excessive force can face liability for that force under § 1983. … That said, our cases leave the *source* of this failure-to-intervene theory unclear." *Id.*, 98 F.4th at 721 (emphasis original). Consistent with *Chaney-Snell*, this Court finds it unnecessary to determine the constitutional origins of Plaintiff's failure-to-protect and/or failure-to-intervene claims. All Defendants are entitled to summary judgment based on the elements of the claims alone.

### C. Summary Judgment is Granted to Officer Shouse on Count 1 and to Officer Tincher on Count 2 but is Otherwise Denied for Plaintiff's Two Excessive Force Claims

---

[14]Plaintiff's remaining four claims against other Defendants are also derivative with respect to his excessive force and inadequate medical care claims. Count 5 alleges that Sheriff Leahy and the Board are liable for their failure to supervise the excessive use of force. Count 6 alleges that Sheriff Leahy the Board were deliberately indifferent to and "ratified" the excessive use of force. Count 9 alleges a failure to supervise inadequate medical care. And Count 10 alleges that SHP, the Sheriff and the Board were deliberately indifferent to and "ratified" inadequate medical care.

Defendant Officers argue that they are entitled to qualified immunity on both prongs of the analysis. They maintain that no reasonable jury could determine that their use of force was so unreasonable that they violated the Fourth Amendment, and that Plaintiff's right to be free of the level of force that they deployed under the circumstances was not clearly established. The Court mostly disagrees. For Count 1 – the use of force in the booking area – the Court denies qualified immunity to all Defendants but for Officer Shouse. The undisputed video record reflects that Officer Shouse did not participate in any force used against Plaintiff in the booking area. For Count 2 – the use of force in the shower room – the Court denies qualified immunity to all but Officer Tincher. It is undisputed that Officer Tincher was not present and played no role in that second use of force, so he alone is entitled to qualified immunity on that claim.

### 1. The Participating Officers' Uses of Force Were Unreasonable

"The Fourth Amendment's standard only permits an officer to use reasonable force to protect himself from a reasonable threat." *Aldini*, 609 F.3d at 867. "To determine if a search or seizure was unreasonable, and thus unconstitutional, courts balance the degree of intrusion on the individual's interests against "the importance of the governmental interests alleged to justify the intrusion." *Colson v. City of Alcoa, Tennessee*, 37 F.4th at 1186 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694 (1985) (additional quotation omitted)). The inquiry is extremely fact-specific, considering the "totality of the circumstances." *Barnes v. Felix*, 605 U.S. at 80 (quoting *County of Los Angeles v. Mendez*, 581 U.S. 420, 427-428 (2017) (additional citations omitted). The amount and degree of force must be carefully considered. *See Eastep v. City of Nashville, Tennessee*, 156 F. 4th 819, 828 (6th Cir. 2025) (emphasizing that the

"ultimate inquiry" is whether the totality of the circumstances justifies the amount of force used). Just as the "reasonableness" for lethal force will differ from the evaluation of non-lethal force, so too will the evaluation of force that causes serious injuries differ from the evaluation of force that causes little to no injury.

In *Graham v. Connor*, 109 S.Ct. 1865, 1872, 490 U.S. 386, 396-97 (1989), a case alleging excessive force during an investigatory *Terry* stop,[15] the Supreme Court explained that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Id.*, 490 U.S. at 396-397. The *Graham* Court found particularly relevant "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*, *supra* at 396; *accord Eastep v. City of Nashville, Tennessee*, 156 F. 4th at 819. In *Kingsley v. Hendrickson*, the Supreme Court recognized that the context of an individual who has already been taken into custody at a jail facility can alter which factors are considered and what weight they are given. *See, e.g., Kingsley*, 135 S.Ct. at 2473 (holding that factors in jail setting may include consideration of "institutional security," while rephrasing *Graham* factors as inclusive of "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.") (internal quotation marks and

---

[15] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968).

additional citations omitted.) And earlier this year in *Barnes v. Felix*, the Supreme Court considered "reasonableness" during a traffic stop, reaffirming the fact-intensive inquiry and need to take into account both individual interests and government interests. *See Barnes*, 605 U.S. at 79 (quoting *Graham*, 490 U.S. at 396). In *Barnes*, the Court found relevant the "actions the officer took during the stop, such as giving warnings or otherwise trying to control the encounter" as well as the "nature and level of threat [the individual] poses, either to the officer or to others." *Id.*, 605 U.S. at 80.

*Graham*, *Kingsley* and *Barnes* highlight the importance of context. A warrantless stop of a suspected armed bank robber fleeing the scene in a vehicle objectively poses a greater risk to the pursuing and arresting officers than would the same individual post-arrest in the custodial Jail setting, after pat down searches have confirmed the removal of all weapons. In the latter scenario, the seriousness of the crime on which the individual was arrested might still be considered, but arguably is of less import than the assessment of threat level inside the Jail.

In the case presented, Plaintiff had been arrested on misdemeanor charges and was already in custody at the Jail when multiple Defendant Officers used a significant amount of force, deploying OC spray and many "tactical strikes" against him. Plaintiff alleges that the force deployed caused a loss of consciousness, multiple broken ribs and a pneumothorax, a lacerated spleen, and a hip impingement. Plaintiff also claims facial, dental, and cognitive injuries. The level of force required to cause such injuries warrants close examination of the severity of the threat that Plaintiff posed, whether Plaintiff was engaged in active resistance to Officers' commands, and any warnings or other efforts to limit the amount of force.

In examining the record, the court can consider all events leading up to the use of force. *See*, *e.g.*, *Feagin*, 155 F.4th at 603, citing *Barnes*, 145 S. Ct. at 1358. In the case presented, the Defendant Officers were aware that the arresting officer had requested assistance and that Lovell was extremely intoxicated and charged with three misdemeanor offenses: disorderly conduct, resisting arrest, and aggravated menacing based on his verbal threats. The video record reflects Lovell's slurred speech and unsteady gait. But the video also clearly shows Lovell's slight size relative to the large number and size of the surrounding male Officers.[16]

When Lovell first arrives, handcuffed and securely held by male Officers on both sides, his verbal communications vacillate between the unintelligible and expletive-laden phrases that express his displeasure, such as "are you fucking kidding me" and "this is bullshit." (DeBord Video 1.) Apart from obnoxious remarks, Lovell physically complies with all commands, spreading his legs and submitting to two separate pat down searches including the removal of his shoes and wedding ring.

During the pat down searches, Plaintiff's verbal remarks focus on Bailey's grip on his right arm.[17] Lovell's verbal irritation increases as Irwin examines him. When officers direct him to "calm down," he turns his head and tells Bailey to "get the fuck off me then." (DeBord Video 1, 2:37-2:52.) Lovell continues to fixate on Bailey's grip. (*Id.*, 3:48 - 4:45.) He states loudly that Bailey needs to "get the fuck off my arm" and  "let go my arm." (*Id.*, 4:22-4:40.) The Defendant Officers respond with denials of malevolent intent; Bailey states he is not "trying to break your arm." (*Id.*, 4:43-4:58.) Officers repeatedly and sternly

---

[16]An arrest record describes Plaintiff as 5 foot 5 inches in height and approximately 155 pounds. (Doc. 58-3, PageID 1301.)

[17]Plaintiff does not allege that Bailey violated the Fourth Amendment by gripping his arm too tightly, nor does the Court perceive any objective unreasonableness in Bailey's grip.

tell Lovell to "stop tensing up" and to "relax." (*Id.*, 4:50-4:58.) They refer to Plaintiff as "boy" and respond to Lovell's profanity with some of their own, directing him to "fucking chill." (*Id.*, 5:08- 5:16.) Apart from verbal hostilities, several male Officers retain a secure grip on Plaintiff during Irwin's examination.

Notably, Officer Shouse is not among the Defendant Officers who physically controls Plaintiff in the booking area; she remained behind the booking counter. Only after the takedown can Officer Shouse be seen briefly moving toward her male counterparts and Plaintiff in order to move the restraint chair out of the way. After moving the restraint chair, she returns to the counter, emerging again only briefly at the end of the use of force to place a protective spit hood over Plaintiff's bleeding face. (DeBord Video 1, 5:33-6:04.)

The Officers' decision to escort Plaintiff to the restraint chair is part of the totality of circumstances insofar as it precipitated the first use of force. The Defendant Officers maintain that the threat level increased when Plaintiff briefly jerked his right hand away as Irwin attempted to place a pulse oximeter on Plaintiff's right hand. But a reasonable jury could find Plaintiff's reflexive movement was not threatening given that Lovell remained firmly under the control of the Officers at all times, and readily submitted to Irwin's placement of the device on his left hand. *See Osborn v. City of Columbus*, No. 22-3570, 2023 WL 2523307, at *5 (6th Cir. Mar. 15, 2023) (concluding that summary judgment was unwarranted because a plaintiff's "attempt[ ] to pull his hand away when [an officer] initially reached for his arms ... could be considered minimal, passive resistance that cannot justify the Officers' uses of force," including a takedown).

Defendants further argue that Plaintiff's verbal agitation and failure to comply with vague commands to "relax" or the more specific instruction to loosen his right hand[18] justified moving Lovell to the restraint chair. (*See* DeBord Video 1, 4:40-5:23.) Defendants contend that verbal hostility alone can be "active resistance," citing to dictum in *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015). But neither *Goodwin* nor any other authority supports a conclusion that drunken comments or verbal belligerence alone, without threatening words or some other physical action, constitutes more than passive resistance. And independent of whether Plaintiff's verbal protestations about Bailey's grip and hand movement justified placing him in a restraint chair, the totality of circumstances do not objectively support the amount of force that Officers subsequently deployed. *See*, *generally*, *Eastep*, 156 F.4th at 829 (noting ambiguity as to whether "more narrow applications of the 'segmented approach'" survive *Barnes* when evaluating the totality of circumstances.)

As justification for their use of takedown maneuvers, tactical strikes and OC spray, the Officers maintain that they took those actions only in response to physical "active resistance" by Plaintiff. For example, they maintain that the first takedown in the booking area was in response to Plaintiff's physical "pulling away" from the four Officers escorting him to the restraint chair. Second, they argue that the tactical strikes and OC spray were reasonable uses of force in response to Plaintiff's failure to offer his arms to be handcuffed after that takedown. And third, they allege that the second takedown, strikes, and use of OC spray in the shower room were all necessary and reasonable in response to Plaintiff's attempt to assault Officer Mullenix and resistance to being subdued. According to

---

[18]As the group walks, two Officers firmly grip Lovell's arms. A few strides away from Irwin, the video shows Lovell's right hand is no longer clenched. (DeBord Video 1, 5:23-5:38.)

Defendants, Plaintiff's active resistance substantially elevated the threat level. But genuine issues of material fact preclude this Court from finding that Plaintiff engaged in *any* active resistance.

Take, for example, the booking area incident. Defendants claim that Plaintiff "increased… efforts to pull away" from Defendants Bailey and Paff as they escorted him to the restraint chair. (Doc. 58-7, PageID 1355 (Bailey's statements in RTR report); Doc. 55, Defendants' manual filing Cler. Co. 261, 5:24-5:31.) After Paff's takedown maneuver, Defendants allege that Plaintiff tucked one arm under his body to prevent them from regaining control and reapplying the handcuffs they had earlier removed. In support, they rely in part on their unsworn statements in the RTR report and the audio portion of the video in which an Officer continually yells: "Put your hands behind your back" and "Stop resisting."

But a picture speaks a thousand words. And the video and still pictures from the record do not match the Officers' shouted words or the statements in the RTR report. (*See* Doc. 58-7.) Simply put, the video of the booking area incident does not show Lovell deliberately and actively pulling away before Paff executed his take-down maneuver. And after Paff executes the takedown, the images show a largely motionless Lovell under the full physical control of four much larger male Officers who have him securely pinned. Contrary to Defendants' report that Plaintiff was actively resisting orders to present his arms for them to re-apply handcuffs, the video appears to support Plaintiff's assertion that neither arm was tucked beneath his body. *See also*, *generally*, *Rudlaff*, 791 F.3d at 641 ("[Active resistance] includes refusing to move your hands for the police to handcuff you, *at least if that inaction is coupled with other acts of defiance*." (emphasis added)). In

the video, Officers Bailey and Mullenix appear to retain their grip on each of Lovell's upper arms as he falls. (DeBord Video 1, 5:31-5:36.) A fifth Officer is visibly ready to step in should Lovell exhibit any resistance, which he does not appear to do. Over a 14-20 second period, an Officer sprays OC spray directly toward Lovell's face, while others deliver "tactical strikes," including closed fist punches. (*Id*., 5:33 – 5:53.)

Defendants alternatively argue that their significant use of force was justified based on institutional risk alone, even without active resistance.[19] Citing *Cretacci v. Call*, 988 F.3d 860 (6th Cir. 2021), they insist that a court may consider "the jail's legitimate interest in maintaining their facility" and "defer[ ] to policies and practices that are needed to preserve internal order and discipline and to maintain institutional security." *Id*., at 869 (additional citations and quotation marks omitted). At the time of the first incident, Lovell was uncuffed and exhibiting increased verbal irritation with Bailey's grip. In such a fraught setting, Officers suggest that the use of force was justified for any *perceived* active resistance due to the possibility of risk, even if it is later deemed that Plaintiff engaged in no more than passive resistance.[20]

---

[19]Defendants also briefly argue that force is objectively reasonable whenever it is used "to preserve internal order and discipline to maintain institutional security… in a jail setting." (Doc. 69, PageID 1854.) In support of the proposition that non-lethal force may be used without any security risk or threat at all, Defendants cite to the majority opinion in a split-panel unpublished decision, *Whyde v. Sigsworth*, No. 22-358, 2024 WL 4719649 at *8 (6th Cir. Nov. 8, 2024), that is factually distinguishable. There, the plaintiff was hallucinating and yelling and pounding on his cell door when officers decided to remove him from the cell and restrain him until his condition stabilized. Whyde refused repeated orders to present his hands to be cuffed, and subsequently refused two orders to turn around after officers entered his cell to cuff him. Officers then took Whyde to the ground, at which point Whyde continued to actively resist attempts to restrain him. It was undisputed that Inmate Whyde disregarded multiple specific and direct orders (to present his hands and turn around) and the takedown was to ensure his own safety as well as that of the officers. Additionally, an unpublished case cannot overrule controlling case law that holds that the security risk or threat level remains an important Fourth Amendment consideration.

[20]Defendants also cite to their expert's opinion that Defendants should be awarded qualified immunity on all counts. (Doc. 56-16.) Plaintiff's expert offers opinions incompatible with qualified immunity. (Doc. 56-21.) The Court declines to consider either expert's opinion on the ultimate legal issues in this case.

But *Cretacci* is easily distinguished. In that case, officers were actively investigating an overheard threat by one inmate to stab another. The plaintiff was sitting in the dayroom and heard the officer's order to lay down but chose not to comply, physically disobeying the direct order. In response, an officer fired a pepperball launcher that struck him on the arm. Cretacci then stood up and began yelling – another physical act of disobedience. After repeating the order to lie down, the officer launched a second round of pepperballs that hit the plaintiff in the back. In short, the institutional threat (a potential stabbing) was significant and the plaintiff was engaged in clear physical resistance (standing up and yelling at officers in response to a command that he lay down) when a single officer deployed minimal force (pepperballs to plaintiff's arm and back) that "led to only minor injuries – bruises that lasted a few days." *Id.* at 869. In contrast to *Cretacci*, a reasonable jury could conclude that the institutional threat in the Jail was virtually non-existent, that Lovell never engaged in any physical resistance at any point, and that multiple Officers reacted with an overwhelming display of non-lethal force that caused significant injuries. In the face of no more than passive resistance, the Officers' use of such force while Plaintiff lay prone and fully subdued in the booking area was objectively unreasonable.

By contrast, Defendant Shouse is entitled to qualified immunity for the first use of force in the booking area (Count 1). Although she did apply a spit hood at the end of that use-of-force, Plaintiff cites to no case that suggests that the act of placing a protective spit hood over an inmate's actively bleeding face at the conclusion of an altercation with other Officers constitutes unreasonable force in violation of the Fourth Amendment.

29

Turning next to the objective reasonableness of the Defendant Officers' second use of force in the shower room, Count 2, the same result is obtained. Except for Officer Tincher who was absent at that time,[21] five Defendant Officers participated in the shower room incident.[22] Without belaboring the point, the video record again reflects a discrepancy between the audio portion of the video, in which Officers yell "stop resisting," and the visual portion.

Defendant Officers cite to their post-incident statements in the RTR report that Plaintiff suddenly jumped up off the bench and charged Defendant Mullenix during the 11 seconds that the shower door remained closed. (*See* Doc. 58-7.) If true, Plaintiff's physical assault on Mullenix would constitute a significant threat that could justify significant force. Defendants insist that because Plaintiff has no present memory of what transpired, this Court must fully credit the RTR report. And in addition to the initial assault, statements in the RTR indicate that Plaintiff continued to actively resist them after the takedown, again keeping his arms beneath his body to avoid being handcuffed.

But the extensive video record casts doubt on the statements in the RTR report and allows a reasonable jury to discredit the Officers' accounts. Based on the visual evidence presented as well as recordings of Plaintiff's contemporaneous comments and post-incident recorded phone calls, a jury could conclude that Plaintiff was physically incapable of charging or assaulting Mullenix behind the closed shower door, and did not

---

[21]Based on his undisputed absence, Officer Tincher is entitled to qualified immunity on Count 2.

[22]In their reply memorandum, Defendants present a new argument that Shouse is entitled to summary judgment on Count 2 because Plaintiff does not name her in his Response but focuses his argument on Officers Bailey, Pemberton, Mullenix and Paff. In addition to the procedural impropriety of presenting new argument in a reply memorandum, Defendants are wrong. In his Amended Response, Plaintiff clearly identifies Shouse's action in punching Lovell four times in his leg and twisting his legs into unnatural positions as excessive uses of force in the shower room. (Doc. 81 at PageID 2522-2523, citing DeBord Video 2, 4:10-4:22.)

engage in any active resistance or combat thereafter. The video record strongly suggests that Plaintiff had some level of injury before entering the shower room. The video also depicts him in a defensive posture from the outset of the second incident. In one image, he is on the floor with both hands protecting his neck – contradicting Defendants' account that he kept his hands beneath his torso to avoid being handcuffed. (Doc. 81-3, PageID 2625.)

A reasonable jury also could conclude that any body movements made by Plaintiff during his fall and as the Officers struck him were involuntary. *See Goodwin v. City of Painesville*, 781 F.3d at 324 (holding that a reasonable jury could discredit evidence that officers told plaintiff to "quit resisting" given contrary evidence that plaintiff's body moments were involuntary); *see also Bates v. Hale*, No. 1:22-cv-488-MWM-SKB, 2024 WL 78532 (S.D. Ohio Jan. 8, 2024) (affirming denial of summary judgment based on genuine issue of material fact concerning whether force was used in room without video, despite officer reports denying use of force at that time). Therefore, Lovell has presented sufficient evidence to present to a jury that both uses of force by the Defendant Officers who were involved in each incident – in the booking area and in the shower room – were unreasonable and in violation of the Fourth Amendment.

## 2. Plaintiff's Showing of a Clearly Established Right

In addition to relying heavily on the RTR report to argue that their uses of force were not unreasonable, Defendant Officers argue that even if they violated the Fourth Amendment, they did not do so in a way that was "clearly established" at the time. To overcome the assertion of qualified immunity, Plaintiff must cite to "a closely analogous precedent with 'facts like the ones at issue here' that placed the constitutional question

beyond debate." *Feagin*, 155 F.4th at 603 (quoting *Rivas-Villegas*, 142 S. Ct. at 8, additional citation omitted). In *Feagin*, the Sixth Circuit reversed the denial of qualified immunity after stressing the plaintiff's burden to cite to "'on-point' and binding caselaw. *Id*., (quoting *Moore*, 126 F.4th at 1167 (citation modified)).

> The combination of these two inquiries -- the Fourth Amendment's reasonable officer test and qualified immunity's fair notice test -- impose two significant hurdles for plaintiffs alleging excessive force claims. *See Browning v. Edmonson County*, 18 F.4th 516, 537 (6th Cir. 2021) (Murphy, J., concurring in part and dissenting in part). After all, to prevail, a plaintiff must show the officer was doubly unreasonable --unreasonable in using force and unreasonable in his assessment of the facts and law -- leaving "all but the plainly incompetent or those who knowingly violate the law" shielded from liability.

*Id*., at 603-604 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *see also Farris v. Oakland County, Michigan*, 96 F.4th 956 (6th Cir. 2024) (holding that "[e]xcept in obvious case…[plaintiffs] must identify analogous caselaw clearly establishing that an officer's specific force violated the Fourth Amendment under the circumstances.")

Defendants do not contest that it was clearly established and beyond debate in 2021 that the Fourth Amendment prohibited the use of force upon an inmate who was "restrained by handcuffs and under control." (Doc. 69, PageID 1857.) But Defendants insist that their use of force did not violate "clearly established" law because Plaintiff was *not* secured by handcuffs at the time that force was deployed. And in Defendants' telling, "the record clearly shows active resistance and a cessation of strikes once ….[Plaintiff] was restrained in handcuffs." (Doc 69 at PageID 1858.)

The Court has already explained why a reasonable jury could conclude that Plaintiff never engaged in active resistance and posed no threat. But Defendants' emphasis on the issue of handcuffs raises the question of whether handcuffs alone make

a difference. In other words, does the use of OC spray and tactical strikes, when a pretrial detainee is engaged in no more than passive resistance and is well-secured and physically pinned down by multiple officers - *but not handcuffed* - violate clearly established Fourth Amendment law? Defendants' own caselaw answers this question affirmatively. *See*, *e.g.*, *Goodwin*, 781 F.3d at 327-328 (discussing multiple cases holding that the use of non-lethal force violates the Fourth Amendment after an arrestee is no longer resisting or is incapacitated). In short, a reasonable officer would have known in February 2021 that the Fourth Amendment is violated by using significant force against a pretrial detainee who is fully controlled and/or is incapacitated, is not engaged in active resistance, and poses no threat. No controlling caselaw provides an exception for the use of force so long as the subdued detainee remains free of handcuffs. *See Baker v. City of Hamilton*, 471 F.3d 601, 607-08 (6th Cir. 2006) ("That [the arrestee] was not handcuffed at the time he was struck does not preclude a finding of unreasonableness."); *Malory v. Whiting*, 489 F. App'x 78, 85 (6th Cir. 2012) (rejecting the argument that the right to be free from excessive force once subdued was not clearly established because the plaintiff was not handcuffed); *see also, Eastep*, 156 F.4th at 830 ("[T]he use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law") (quoting *Baker*, 471 F.3d at 607)); *Feagin*, 155 F.4th at 603 (holding that liability is imposed when an officer tases a suspect who poses no danger and is fully compliant or has completely ceased resisting at the time of tasing.)[23]

---

[23]In *Feagin*, the Sixth Circuit found "plenty" of active resistance but held that even if record left "the exact nature of the threat or degree of resistance unclear," qualified immunity required the court to give the defendant officers the benefit of the doubt in a case involving non-lethal taser use. Notably, *Feagin* did not alter the controlling standard in a case like this one, where a reasonable jury could conclude that there was no active resistance at all, and the amount of force deployed – while non-lethal – was significant enough to result in serious injuries.

In addition to the clearly established caselaw cited above, Plaintiff cites to *Jennings v. Fuller*, 659 F. App'x 867 (6th Cir. 2016). In that case, videotape showed that Jennings disobeyed a verbal command to keep his hands up on a wall during a pat down search in the booking area, briefly but non-aggressively lowering one hand. *Id.* at 869. In response, an officer twice his size "smashed him against a concrete wall, slammed him onto a metal bench, and then pinned him to the ground." *Id.* at 867-868. Unlike this case, Jennings admitted to actively resisting once other officers jumped into the fray. Those officers engaged in "all sorts of rough handling," eventually tasing Jennings and securing him face down on a restraint bed where they left him unattended for three hours. *Id.* at 870. The Sixth Circuit denied qualified immunity.[24] Though *Jennings* is unpublished, it is persuasive authority that the use of force will violate "clearly established" Fourth Amendment law if there is no evidence that the inmate "posed a threat to anyone." *Id.*[25]

Defendants attempt to distinguish *Jennings* on grounds that Lovell resisted arrest and was charged with aggravated menacing for verbal threats prior to his arrival at the Jail. But a reasonable jury still could conclude that Defendants' use of force was such a "gross overreaction" to any possible threat that Plaintiff posed after being taken into custody that it violated clearly established Fourth Amendment law. *See id.* at 870. Defendants' argument that Plaintiff was engaged in a greater amount of active resistance

---

[24]Following the Sixth Circuit's decision, a jury awarded Jennings approximately $19 million, but the trial court granted the defendants' motions for a significant remittitur. *See Jennings v. Fuller*, No. 13-13308, 2017 WL 2242357 (E.D. Mich. May 23, 2017).

[25]Plaintiff also cites to *Jennings* to support newly asserted excessive force claims regarding the amount of time he spent wearing a spit bag in a restraint chair prior to being decontaminated. As discussed *infra*, those claims are not cognizable due to Plaintiff's failure to properly plead them. Additionally, the unpublished *Jennings* is not "clearly established" caselaw that would have informed Defendant Shouse in 2021 that the mere act of placing a protective spit hood over Plaintiff's bleeding face immediately following a violent altercation could be considered a use of force at all, much less excessive force.

than in *Jennings* is persuasive only if this Court resolves the genuine issues of material fact in their favor, which the Court cannot do on summary judgment.[26]

### D.  Summary Judgment is Granted on Counts 3 and 4

Although the participating Defendant Officers are not entitled to summary judgment on Counts 1 and 2, they are entitled to judgment on several related claims. For example, Counts 3 and 4 allege that all Defendant Officers violated both Fourth and Fourteenth Amendment rights by failing to intervene or protect Plaintiff from each other's objectively unreasonable use of force. In *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997), the Sixth Circuit held that in order to be liable on a failure-to-intervene claim, an officer first must have "observed" the force "or had reason to know" that excessive force would be used. Second, the officer must have "both the opportunity and the means" to stop it. To have that opportunity, a plaintiff must show that the use of force occurred over a sufficient span of time for the observing officer to intervene. Again, the focus is on the totality of circumstances, including whether the use of force was continuous or occurred at different times, what the observing officer was doing at the time the force occurred, and whether statements made by the officers suggested the use of force was imminent or whether it occurred without warning. *See Chaney-Snell*, 98 F. 4th at 722 and 733.

In *Chaney-Snell*, an arrestee who pled guilty to attempting to resist arrest sued for excessive force and for failure-to-intervene, alleging that an officer twice punched him in the face while another kneed him in the back and dragged him across the floor *after* he had peacefully surrendered. Defining the elements of a failure-to-intervene claim, the

---

[26]A witness in *Jennings* had reported that he had smoked crack and discharged a gun prior to his arrest. In this case, the record is silent concerning what details the Defendant Officers knew about the degree to which Lovell resisted arrest or engaged in kicking the inside of the police vehicle during transport.

Sixth Circuit first considered "[h]ow long is long enough?" for an officer to have a realistic chance to end another's unlawful use of force. The court observed that force that lasts "ten seconds or less" would not provide sufficient time to intervene, whereas "ongoing force that lasts a minute or more" often will prove "long enough" to intervene. *Id.*, 98 F.4th at 722 (collecting and reviewing cases). In addition to the length of time, *Chaney-Snell* noted the relevance of whether the allegedly unlawful force continued "unabated" or whether it occurred at discrete and episodic moments, such as two punches separated by a brief interlude. *Id.* at 723 (quoting *Wells v. City Dearborn Heights*, 538 F. App'x 631, 634-35, 640 (6th Cir. 2013)). "Plaintiffs will … have a more difficult time showing that officers could have ended force if they were distracted by other duties rather than merely looking on, but "will have an easier time holding officers liable for a short use of force if the officer who engaged in it signaled an intent to do so ahead of time." *Id.* (citations omitted.) *Chaney-Snell* reversed the denial of qualified immunity in part because - while the district court had treated the actions of the officers as a single continuous use of force - no published case law defined when force should be treated as "a single continuous use of force" rather than as "quick and discrete actions." *Id.* And if the punches, the kneeing and the dragging were viewed as individual "incidents," "a reasonable officer could believe that each separate incident ended too quickly to trigger 'a duty to intercede.'" *Id.* (quoting *Barton*, 726 F. App'x at 367).

In this case, all six Defendant Officers are entitled to qualified immunity on the failure-to-intervene claim in the booking area incident. Defendant Shouse is entitled to qualified immunity because Plaintiff does not identify how she could have prevented the takedown, which occurred suddenly and without warning. Shouse is also entitled to

qualified immunity for the 14-to-20-second deployment of force after the takedown, which includes tactical strikes and the use of pepper spray. Given the short time frame and totality of circumstances, Shouse was distracted by her actions in moving the restraint chair out of the way. In addition to that distraction, video records confirm that her ability to see (including her ability to independently determine whether Plaintiff was actively resisting) was limited by her physical position and her fellow officers' relatively large frames obscuring her view. *Contrast Laury v. Rodriguez*, 659 F. App'x 837, 848 (6th Cir. 2016).

Though more actively engaged, the remaining Defendant Officers are also entitled to qualified immunity on Count 3 based on their lack of opportunity to intervene in the booking area. The brief incident began without warning, after the abrupt takedown by Paff. The fact that four Officers were simultaneously engaged in inflicting force limited their ability to observe the force being inflicted by others. The fifth officer was similarly distracted by trying to position himself to assist his fellow officers with a limited ability to see past their physical frames in seconds in which one officer was yelling "stop resisting." No reasonable jury could find that any of the six Officers had the opportunity or means to prevent the excessive force. *See Wright v. City of Euclid, Ohio*, 962 F.3d 852, 872 (6th Cir. 2020). In addition, a "failure-to-intervene" claim against an officer who is himself simultaneously engaged in alleged excessive force is redundant. *See Riethmeier v. Oakland County* ___ F. Spp.3d ___, 2025 WL 3046196, at *13 (E.D. Mich. Oct. 30, 2025) (granting summary judgment to officers on failure-to-intervene claim because they themselves were the source of the excessive force).

The failure-to-intervene claim regarding the second use of force in the shower room, Count 4, presents a closer issue, in part because the total time during which the Defendant Officers deployed a takedown, dozens of tactical strikes, and OC spray, was more than a minute. Even if the Officers had sufficient time to intervene, however, they remain entitled to qualified immunity in the absence of any on point and controlling caselaw that "clearly established" that an officer whose focus and ability to observe the conduct of others is distracted by his own simultaneous use of force can be held liable for a failure-to-intervene. Therefore, the Court grants qualified immunity to all Defendant Officers on both failure-to-intervene claims, Counts 3 and 4.

### E. Summary Judgment is Granted on Plaintiff's Deliberate Indifference Claims (Count 7)

Count 7 of Plaintiff's amended complaint alleges that all six Defendant Officers and Nurse Irwin violated the Fourteenth Amendment by failing to provide him with adequate medical care. Irwin argues that she is entitled to summary judgment based on Plaintiff's inability to prove that she rendered deficient care. The six Defendant Officers assert qualified immunity in part based on the same argument - that Plaintiff cannot prove a constitutional violation. Even if he could prove constitutionally deficient medical care, the Defendant Officers assert that they remain entitled to qualified immunity based on Plaintiff's inability to prove that "clearly established" law prohibited their conduct.

### 1. Defining the Scope of Plaintiff's Medical Care Claims

A defendant violates an inmate's constitutional right to adequate medical care when he or she exhibits deliberate indifference to the inmate's serious medical need. In order to prove a constitutional violation, Plaintiff must show both an objective component - that he had a sufficiently serious medical need - and a subjective component - that each

Defendant had the requisite level of subjective awareness of his substantial risk of serious harm. *See*, *generally*, *Farmer v. Brennan*, 511 U.S. 825 (1994); *Brawner v. Scott Cnty.*, 14 F.4th 585 (6th Cir. 2021).

On summary judgment, Defendants argue that they did not exhibit deliberate indifference to Plaintiff's serious medical needs at any time. In his complaint, Plaintiff does not dispute the constitutional adequacy of his medical care after 11 a.m., when Nurse Davis examined him and ordered x-rays that led to his transfer to a local hospital. Instead, Plaintiff disputes only the adequacy of the medical care provided prior to Nurse Davis's examination. Count 7 specifically alleges that all six Defendant Officers and Nurse Irwin caused "further injury" by failing to "take reasonable measures" to provide him with more immediate medical care. But the complaint does not identify the nature of the "further injury", nor does it specifically allege when each individual Defendant learned of his alleged need for additional care but failed to attend to that need within a reasonable time.

Further narrowing the scope of Plaintiff's claim, Plaintiff does not challenge the Defendant Officers' assertion that he had no serious medical need that was sufficiently obvious to a layperson before 4:30 a.m. Rather, Plaintiff argues that his need for increased medical care had become "obvious" when the Defendant Officers took him to the shower room and released him from the restraint chair a second time. (*See* Doc. 81, PagID 2554.) The Court agrees with Plaintiffs' implicit concession that he did not show an "obvious" serious medical need for which more immediate medical attention was required prior to 4:30 a.m. Thus, even if Plaintiff initially sought to plead deliberate indifference based on the Officers' failure to offer decontamination immediately after deploying OC spray, he has abandoned any claim on summary judgment. Accordingly,

the Court construes Count 7 on summary judgment as limited in scope to the roughly six and a half hour delay in medical treatment between 4:30 a.m. and 11 a.m., during which Nurse Irwin and the six Officers allegedly exhibited deliberate indifference by failing to provide him with greater medical care.

A claim that a defendant violated constitutional standards based on a delay in treatment is generally more difficult to prove than a complete denial of treatment. "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). In addition, in order to prove his claim against each individual Defendant, Plaintiff must show that each exhibited deliberate indifference to his serious medical needs during the relevant time frame. *See also Hehrer v. County of Clinton, Michigan*, ___ F.4th ___, No. 24-2016, 2025 WL 3564162 at *6 (6th Cir. Dec. 12, 2025) (holding that a plaintiff must overcome the assertion of qualified immunity for each defendant, citing *Greene v. Crawford County, Michigan*, 22 F.4th 593, 607 (6th Cir. 2022)).

In the case presented, the record reflects that Defendants Tincher, Bailey, and Shouse were not present and had no interaction with Plaintiff between 4:30 a.m. and 11 a.m.[27] Given their absence and Plaintiff's failure to cite to evidence that they became

---

[27]Plaintiff does not refer to Bailey or Tincher in his memorandum in opposition to summary judgment on Counts 7 and 8, and therefore has abandoned deliberate indifference claims against those two Defendants. Although Plaintiff does refer to Defendant Shouse, the video record confirms that she was not present and did not interact with Plaintiff during the relevant time period.

aware of his serious medical need between 4:30 a.m. and 11:00 a.m., those three Defendant Officers are entitled to summary judgment on Count 7.[28]

### 2. Plaintiff's Failure to Prove a Fourteenth Amendment Violation in Count 7

The three remaining Officers, Mullenix, Pemberton and Paff, argue that Plaintiff cannot overcome their assertion of qualified immunity in part because he cannot establish medically deficient care that violates the Fourteenth Amendment. Nurse Irwin similarly argues that no constitutional violation occurred. The Court agrees that Irwin, Mullenix, Pemberton and Paff did not exhibit deliberate indifference to any serious medical need during the relevant time period in violation of the relevant Fourteenth Amendment standard. Therefore, those four Defendants are also entitled to summary judgment on Count 7.[29]

### a. The Fourteenth Amendment Deliberate Indifference Standard

On February 28, 2021 when the events in question took place, courts required plaintiffs proceeding under the Fourteenth Amendment to prove the same objective and subjective components of a deliberate indifference claim as is required under the Eighth Amendment. *See Farmer v. Brennan*, 511 U.S. 829 (defining Eighth Amendment standard). But in September 2021, the Sixth Circuit held in *Brawner v. Scott Cnty.*, 14 F.4th 585, that a lower burden of proof applies to the subjective component of Fourteenth Amendment claims brought by pretrial detainees. Under the Eighth Amendment, a plaintiff must show that "an official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. So an Eighth Amendment plaintiff must show that the

---

[28]In addition, despite Plaintiff's insistence in his responsive memorandum that Officer Newsome also was deliberately indifferent to his medical needs, Newsome has never been a named Defendant.
[29]Plaintiff's failure to prove an underlying constitutional violation serves as an additional basis for dismissal of deliberate indifference claims against Tincher, Bailey, and Shouse.

official was "both … aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," and that the official actually drew the inference. *Id.* In other words, the subjective component under the Eighth Amendment requires proof of the official's actual knowledge.

By contrast, *Brawner* held that a lower standard akin to civil recklessness applies to the subjective component of Fourteenth Amendment claims. *Brawner* defined the new standard as "more than negligence but less than subjective intent -- something akin to reckless disregard." *Brawner*, 14 F.4th at 596 (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc)). The Sixth Circuit recently clarified that *Brawner* applies retroactively to *any* deliberate indifference claim brought by a pretrial detainee – regardless of when the incident occurred. *See Hehrer*, ___ F.4th ___, 2025 WL 3564162 at *5. Therefore, the new *Brawner* standard for the subjective component controls whether Plaintiff can establish his Fourteenth Amendment claim.

### b. Plaintiff's Failure to Prove the Objective Component

Although *Brawner* altered the subjective component, it did not change evaluation of the objective component of a claim based on deficient medical care. The objective component of a deliberate indifference claim requires Plaintiff to show a medical need objectively "serious" enough to require *some* medical treatment, meaning that the condition posed a substantial risk of serious harm if left untreated. But the existence of a medical condition, standing alone, is not enough. To fully satisfy the objective component, the plaintiff also must show that his serious medical need was not addressed within an objectively reasonable time frame. Here, Defendants argue that Plaintiff cannot prove that objective component.

A plaintiff can establish a serious medical need if the evidence shows a need "that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Grote v. Kenton Cnty.*, 85 F.4th 397, 406 (6th Cir. 2023) (internal quotation omitted). How "obvious" a medical need is (including whether the condition requires emergent treatment) determines whether additional proof is required to satisfy the objective component.

> [I]n cases where the medical need is "'so obvious that even a layperson would easily recognize the necessity for a doctor's attention,' the plaintiff need not present verifying medical evidence to show that, even after receiving the delayed necessary treatment, his medical condition worsened or deteriorated." *Blackmore*, 390 F.3d at 899-900 (quoting *Gaudreault v. Mun. of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)). "Instead, it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Id.* at 900.

*Burwell v. City of Lansing, Michigan*, 7 F.4th 456, 463 (6th Cir. 2021) (quoting *Blackmore v. Kalamazoo County*, 290 F.3d 890 (6th Cir. 2004)).

Here, Plaintiff voiced pain complaints and exhibited some level of physical injury consistent with the need for medical care around 4:30 a.m. The video record confirms that Lovell required assistance to walk, was bent at the waist, and announced, "I think I need to see somebody right now" as he left the shower room. (DeBord Video 3, 7:40-7:50.) Mullenix obtained a wheelchair, and Pemberton and Paff assisted him into the chair and reassured him that the nurse would soon check him. (*Id.*, 7:45-8:00.) Lovell audibly exclaims and groans and complains of rib pain and a broken dental device.

But Defendants assert that Plaintiff's rib fractures and associated internal injuries were latent or hidden, and were not so obvious as to put them on notice that he required *immediate or emergent* medical treatment at the time that they interacted with him. Based on their assertion that the need for emergent treatment was not obvious, Defendants

further argue that Plaintiff cannot prove that the six and a half hour delay that he experienced before receiving a more complete evaluation by Nurse Davis was unreasonable, or that the delay caused any harm.

The video record confirms that Paff advised Irwin both of Plaintiff's complaints of rib pain and of the pain patch discovered on his knee. (DeBord Video 3, 8:20-8:40.) Although Irwin asks about the pain patch, she focuses her exam on Plaintiff's restraint points, prompting Plaintiff to protest: "It's not my knee, it's my upper body." In an affidavit, Irwin attests that she also palpated his torso, but the Court credits Plaintiff's account that she did not do so at that time based on video evidence. After Irwin departs, Defendant Officers help Plaintiff to a bed in Cell 309 so that he could lay down for the remainder of the evening. In response to Plaintiff's statement that he "hurt bad," Paff responds reassuringly and advises Plaintiff to "let me know if you need anything." (DeBord Video 4 0:45-1:15.) Plaintiff states that he believes his ribs are broken and asks for a mat. The Officers do not directly respond to his comment about his ribs but tell him that they will look into getting him a mat later after he gets some sleep. (DeBord Video 3 at 9:10-9:44.) There is no further record of any complaints or requests for medical attention.

Because Plaintiff does not dispute the adequacy of medical care beginning around 11 a.m., the evaluation of the objective component of his claim boils down to whether the delay in his care between 4:30 a.m. and 11 a.m. was objectively "reasonable" under the Fourteenth Amendment. What constitutes a reasonable time frame for treatment varies based on the nature of the medical condition. Here, Plaintiff's evidence of the type of "obvious" injury that would require *emergent* medical treatment at about 4:30 a.m. is insufficient to prove the objective component of his claim.

Obvious symptoms of a heart attack or stroke or profuse bleeding from a stab strongly suggest a need for immediate or emergent medical care. Complaints of an earache or toothache do not. Broken bones fall somewhere in between these two extremes, depending on the circumstances. An open wound exposing a broken bone suggests a more urgent need for treatment than does a hidden hairline fracture. In multiple cases, courts have found no constitutional violation where x-rays were delayed for hours even when the injury was an obvious fracture. *See*, *e.g.*, *Hubbard v. Gross*, No. 05-5088, 2006 WL 2787004, at *5 (6th Cir. Sept. 27, 2006) (affirming directed verdict because a two hour delay in obtaining medical care for an arrestee's broken hand--though an obvious and serious medical need - was not unreasonable); *Gray v. Dorning*, 202 F.3d 268, 1999 WL 1336118, *1 (6th Cir. Dec. 20, 1999) (holding that an 8-hour delay in treatment for a broken wrist was not a constitutional violation).

A rib fracture is usually less "obvious" than a fracture to a hand or foot. Here, Plaintiff's reported and observable rib pain did not "obviously" require *emergent* medical attention to avoid a substantial risk of serious harm, such that Defendants' decision to let Plaintiff rest and sleep off his intoxication for six and a half hours before performing a more complete medical assessment violated constitutional norms. *Contrast Kimbrough v. Core Civic*, No. 1:19-cv-0048, 2019 WL 2501558 (M.D. Tenn. June 17, 2019) (holding that it was unreasonable to wait 23 days to provide any medical care for plaintiff's broken bone). The Defendant Officers observed the clearly-intoxicated Plaintiff over the preceding hours sleeping peacefully in the restraint chair without any indicia of severe pain. Irwin also repeatedly observed Plaintiff comfortably asleep in the restraint chair for much of her shift. In addition, after Irwin examined Plaintiff and the Defendant Officers

placed him in Cell 309, Plaintiff made no further complaint until he was assessed by Nurse Davis. (Paff Aff., Doc. 50; Mullenix Aff. Doc. 49.) The fact that Plaintiff ultimately was diagnosed with fractured ribs and other internal injuries after being referred for imaging studies does not subject Irwin to liability for her failure to immediately order x-rays at 4:30 a.m. Mere negligence or malpractice is insufficient to state a constitutional claim. *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

Nor does the Defendant Officers' reliance on Irwin's assessment subject them to liability. The Officers, who lacked medical expertise, acted reasonably simply by asking Irwin to assess Plaintiff. *See Hehrer*, 2025 WL 3564162, at *6 (holding that officers "typically act reasonably by referring an inmate's health concerns to medical personnel"); *Hodges v. Abram*, 138 F. 4th 980, 987-989 (6th Cir. 2025). If trained medical personnel fail to discover a serious medical condition for which urgent treatment is needed, the condition is unlikely to be deemed to be "obvious" to a layperson. *Id.*

Here, the Defendant Officers were entitled to rely on the fact that Irwin was aware of Plaintiff's complaint of rib pain and spoke to and examined him without ordering additional or emergent treatment. Therefore, they are entitled to qualified immunity on Plaintiff's claim that they should have sought out additional care before placing him back into Cell 309 to sleep. "A mistaken, albeit reasonable, belief that such deference to a provider is warranted will not rise to the level of deliberate indifference." *Grote v. Kenton County*, 85 F.4th at 412 (citing *McGaw v. Sevier County*, 715 F. App'x 495, 498 (6th Cir. 2017)).

Plaintiff insists that the facts of this case warrant an exception to the general rule of deference to Irwin's medical judgment. In *Hehrer*, the Sixth Circuit recently set out a list of recognized exceptions to the rule of deference:

> [D]eference to medical judgments has its limits. An officer might act recklessly, for example, if the officer does not seek medical help after an inmate suffers from "new and alarming symptoms" since last seeing a medical professional. *Stojcevski v. Macomb County*, 827 F. App'x 515, 522 (6th Cir. 2020) (quoting *Barberick v. Hilmer*, 727 F. App'x 160, 163-64 (6th Cir. 2018) (per curiam)); *see, e.g.*, *Greene v. Crawford County*, 22 F.4th 593, 608–09 (6th Cir. 2022); *Smith*, 505 F. App'x at 535. Or an officer might act recklessly if the officer defers to an unethical healthcare worker that the officer knows mistreats inmates. *See Smith*, 505 F. App'x at 532. And, of course, an officer might act recklessly if the officer fails to implement a medical professional's own instructions.

*Hehrer*, 2025 WL 3564162, at *6 (citing *Howell v. NaphCare, Inc.*, 67 F.4th 302, 316 (6th Cir. 2023)).

But Plaintiff does not rely on any of the *Hehrer* exceptions, and the facts do not support their application. Instead, citing to *Colson v. City of Alcoa*, No. 3:16-cv-377, 2018 WL 1512946 at *12-13 (E.D. Tenn. Mar. 26, 2018), Plaintiff argues that the Officers' deference was not warranted because they either knew or should have known that he had suffered an injury to his ribs, and the Officers who were present would have observed that Irwin did not examine Plaintiff's torso. In *Colson*, the trial court denied summary judgment after concluding that an officer who had witnessed plaintiff's mobility issues and pain complaints and was present for the nurse's examination had reason to believe that the nurse's medical judgment was not reliable. But in *Colson*, the officer admitted to subjective knowledge that the nurse's examination was overly cursory. There are no such admissions in this case. In addition, *Colson* is not sufficient to defeat the Officers' assertion of qualified immunity because it is an unpublished district court case.

Because the extent of Plaintiff's injuries and/or need for emergent treatment were not obvious, his failure to present evidence that the delay in diagnosis caused any worsening of his condition adds to his failure to satisfy the objective component of his claim. For a nonobvious emergency condition, a plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Hodges*, 138 F.4th at 990 (quoting *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005)); *see also Burgess v. Fischer*, 735 F.3d 462, 470, 476-477 (6th Cir. 2013) (facial and head fractures, which were not obvious and discovered after CT scans were taken later, did not satisfy objective component where plaintiffs failed to show that a delay in treatment caused injuries to worsen); *Spurlin v. Wilson*, 2024 WL 3745013, at *7 (W.D. Ky. Aug. 9, 2024) (orbital bone fracture, nasal bone fracture and left rib fractures were not "serious medical needs" because they were not "obvious or apparent to a lay person" and there was no evidence that those injuries "were exacerbated by a delay in treatment.")

Once Nurse Davis ordered x-rays and Plaintiff was referred for additional imaging and outside treatment, he was provided pain medications and monitored, but did not require any clinical intervention because his injuries were self-healing. (Doc. 57-7, PageID 1087; *see also* Doc. 46, PageID 834-835 (Plaintiff's expert's testimony that the pneumothorax and spleen laceration can resolve on their own.)). *See also May v. Akers*, 5:21-cv-182-DCR, 2023 WL 2611034, at *9 (E.D. Ky. March 23, 2023) (granting summary judgment on objective component of deliberate indifference claim under Eighth Amendment where x-rays showed healing rib fractures that required no further treatment.); *Reynolds v. Elizabeth*, No. 1:11-CV-P142-JHM, 2016 WL 1047796, at *7 (W.D. Ky., Mar. 10, 2016) (no constitutional injury where plaintiff with rib fractures went

without pain medication for 10 days but treatment did not change once he was properly diagnosed); *Loukas v. Gundy*. 70 F. App'x 245 (6th Cir. 2003) (no constitutional violation where x-rays were not taken until 18 days after injury, revealing break in foot that did not require a cast or other procedure, but only crutches and pain medication.); *Ruff v. Health Care Adm'r*, No. 3:CV-10-0603, 2011 WL 1344625, at *2-4 (M.D. Pa. Apr. 8, 2011) (finding two-year delay in ordering an x-ray of the prisoner's fractured ribs to be "regrettable" but finding no proof of any detrimental effect due to the delay).

In short, it was not obvious that Plaintiff's latent injuries, which could not be detected without imaging studies, required either urgent or emergency treatment at or around 4:30 a.m. Because Plaintiff cannot prove that any Defendant failed to attend to his serious medical condition within an objectively "reasonable time frame," *see Blackmore*, 290 F.3d at 900, he fails to prove the objective component of his claim. Therefore, Nurse Irwin and the Officers who interacted with him on or after 4:30 a.m. are entitled to summary judgment on Count 7.

### c.  A Failure to Prove the Subjective Component under *Brawner*

Even if Plaintiff could establish the objective component of his deliberate indifference claim, all individual Defendants still would win summary judgment based on his failure to establish a constitutional violation based on the subjective component, as now defined by *Brawner*. Plaintiff has no evidence that a 6.5 hour delay in obtaining imaging and a formal diagnosis for self-healing injuries subjected him to an unjustifiably high risk of harm that either was known, or was so obvious that it should have been known – much less that Irwin acted with more than negligence (at most) when she failed to immediately order x-rays. For the same reasons, Plaintiff cannot prove that any of the

Defendant Officers exhibited the type of civil recklessness that is required to establish the subjective component of a deliberate indifference claim under *Brawner*. There is simply no evidence that they had any reason to appreciate any increased risk to Plaintiff that accrued as a result of delaying Plaintiff's more complete examination until later that morning. *See Erickson v. Gogebic Cnty., Michigan*, 133 F.4th 703, 712 (6th Cir. 2025) (Officer had no subjective awareness of broken rib despite use of force; broken rib was not a visible injury that obviously required immediate medical attention).

### d. A Failure to Prove the Subjective Component Under *Farmer*

All Defendants are entitled to summary judgment based on Plaintiff's failure to prove that any constitutional violation occurred under *Brawner*. For the sake of completeness, however, the Court briefly considers whether - even if Plaintiff could establish a constitutional violation under current law - a reasonable Officer would have known that his conduct violated "clearly established" law at the time the events occurred. Considering this issue, the Defendant Officers would still be entitled qualified immunity. *Farmer* and not *Brawner* was the "clearly established" law on February 28, 2021. *See Hehrer, supra*; *see also Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919, 927-28 (6th Cir. 2024) (holding that for qualified immunity purposes, the subjective standard established in *Farmer* applies to claims arising prior to September 2021). To overcome the Defendant Officers' reasonable reliance on *Farmer*, Plaintiff must show that *each* Defendant subjectively perceived that his failure to seek additional immediate or emergent medical attention created a significant risk to Lovell's health, and that each "'consciously' (not recklessly) disregarded that risk." *See Lawler*, 93 F.4th at 928 (quoting

*Farmer v. Brennan*, 511 U.S. at 839). A "shotgun approach" that alleges that all Defendants are equally culpable is insufficient. *See Grote*, 85 F.4th at 413.

As previously discussed, Tincher, Bailey and Shouse were not present when Plaintiff asserts that his serious medical need for emergent treatment became obvious. For the same reasons that he cannot satisfy the more lenient subjective standard of *Brawner*, Plaintiff is unable to show that any of the remaining three Officers had actual knowledge that he faced a substantial risk of harm without immediate medical attention. In short, even if Plaintiff could establish a violation of the Fourteenth Amendment under *Brawner* based on the delay in medical care, the three Officers would remain entitled to qualified immunity due to Plaintiff's inability to show a violation of "clearly established" law under *Farmer*.

## F. Summary Judgment is Granted to all Defendants on Remaining Claims

As previously stated, Plaintiff's excessive force and medical care claims (Counts 1, 2, and 7) form the bedrock of his complaint. Seven additional claims are derivative. All Defendants are entitled to summary judgment on all of those remaining claims.

### 1. Summary Judgment is Granted to Sheriff Leahy

Due to the substitution of Sheriff Stratton for claims asserted against the Sheriff in his official capacity, the only claims that remain against Sheriff Leahy are those filed against him in his individual capacity. Sheriff Leahy is entitled to summary judgment because there is no *respondeat superior* liability under § 1983. *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021). A "§ 1983 claim must fail against a supervisory official unless the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Cardinal v. Metrish*, 564 F.3d 794, 802-03 (6th Cir. 2009)

(internal quotation marks and additional citations omitted). "At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Grinter v. Knight*, 532 F.3d 567,575 (6th Cir. 2008) (quotation omitted). To prove liability against former Sheriff Leahy, Plaintiff must show that he was actively involved in offensive conduct that caused injury in a way that shows deliberate indifference. *Helphenstine v. Lewis County, Kentucky*, 60 F.4th 305 (6th Cir. 2023) (affirming summary judgment to supervising jailer based on a "failure to supervise" claim). In addition, Plaintiff must show a "'causal connection' between the defendant's 'active unconstitutional behavior' and the plaintiff's injuries." *Crawford*, 15 F.4th at 761-762 (quoting *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016)).

Plaintiff's amended complaint contains only conclusory allegations that Sheriff Leahy knew or should have known that the Defendant Officers would use excessive force, and/or that he failed to train and supervise the Defendant Officers and Nurse Irwin. But Sheriff Leahy may be held liable in his individual capacity only if Plaintiff can point to "a specific action" that would defeat qualified immunity. *See Phillips v. Roane Cnty., Tenn.,* 534 F.3d 531, 544 (6th Cir. 2008) (dismissing claims against sheriff, mayor, and director of ambulance services). Plaintiff cites to no evidence at all that suggests that Sheriff Leahy in any way encouraged, condoned, approved or knowingly acquiesced in a violation of Plaintiff's constitutional rights. Plaintiff also points to no evidence of Sheriff Leahy's personal involvement in any use of force.

It appears that Plaintiff seeks to hold Sheriff Leahy liable solely because he was ultimately responsible for jail policies. But that is not a sufficient basis on which to impose

"failure-to-train" liability on a supervisor. There is no evidence that Sheriff Leahy was personally aware that the use-of-force policies were not being followed, nor does Plaintiff point to evidence that Sheriff Leahy failed to take steps to ensure that policies were followed. *See Taylor v. Michigan Dept. of Corr.*, 69 F.2d 76, 81 (6th Cir. 1995). To the extent that Plaintiff seeks to impose liability on the Sheriff based on his personal lack of oversight, Plaintiff's claim is more appropriately viewed in the context of Plaintiff's *Monell* claim[30] against the Sheriff in his official capacity (now Sheriff Stratton) rather than as an individual capacity claim. *See Poynter v. Whitley Cnty. Detention Ctr.*, 722 F. Supp. 3d 745, 756 (E.D. Ky. 2024) (granting summary judgment to jailer because in the absence of personal involvement, "an attempt to hold an officer liable in his individual capacity for his alleged failure to adequately train employees...improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability.") (cleaned up).

### 2. Sheriff Stratton and the Board are Entitled to Judgment on *Monell* Claims Asserted in Count 5

The Clermont County Sheriff in his official capacity (now Sheriff Stratton) and the Board are also entitled to summary judgment on Count 5. Count 5 alleges *Monell* liability against the Sheriff and the Board[31] based on their "Failure to Supervise Excessive Force." To succeed, Plaintiff must show that one or more County policies or customs resulted in the alleged violation of Plaintiff's constitutional rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. at 691.

---

[30]*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).
[31]Plaintiff's claim against the Sheriff in his official capacity (currently Sheriff Stratton) is the same as a claim against the County. *See Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989) (holding that an "official capacity" claim is "equivalent to a suit against the local government entity.").

But Count 5 contains only conclusory allegations unsupported by facts. For example, Plaintiff alleges in relevant part that "Defendants Sheriff Leahy and/or the Clermont County Board of Commissioners failed to properly train, supervise, and monitor the officers in their employ in [the] proper use of force," and that the Sheriff and Board "had knowledge of or should have had knowledge…[of] these officers' propensity to pose an unreasonable risk of utilizing excessive and objectively unreasonable force on inmates under color of state law." (Doc. 23, ¶¶ 74, 76.) Plaintiff further alleges that the County's "neglect to properly supervise, discipline, and train these officers indicates a systematic intentional indifference to the rights of citizens to be free from the use of excessive and objectively unreasonable force by members of that department through their official policy, longstanding practice, and custom." (*Id.*, ¶ 77.) Last, Plaintiff alleges that the County's "failure to train, supervise, and monitor the officers foreseeably caused" his injuries, and "was a reckless or intentional indifference" that was "the moving force behind" his injuries. (*Id.*, ¶¶ 78-79.) Vague and conclusory allegations that the Sheriff and Board had some sort of "official policy, longstanding practice, and custom" that led its employees to use excessive force or to exhibit deliberate indifference to Plaintiff's serious medical needs are insufficient to state a *Monell* claim. *See Braunskill v. Smith*, No. 1:24-cv-140-MWM-SKB, 2024 WL 4465269, at *4 (S.D. Ohio Jun. 11, 2024); *Brown-Austin v. Chambers-Smith*, No. 1:24-cv-397, 2025 WL 2022262, at *13 (S.D. Ohio July 18, 2025), R&R adopted at 2025 WL 2615030 (S.D. Ohio Sept. 10, 2025).

In addition, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350 (2011). On summary judgment "the question … is whether the County's

failure to train its employees amounted to deliberate indifference…to the rights of the detainees." *Helphenstine*, 60 F.4th at 323 (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). This sort of claim is only available in a narrow range of circumstances where a federal rights violation "may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations." *Helphenstine*, 60 F.4th at 323 (citing *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown* 520 U.S. 397, 409 (1997)).

Here, Plaintiff fails to identify *any* specific policy or custom that caused his injuries. Defendants also point to a lack of evidence that connects any policy to Plaintiff's injuries.

> To succeed on a failure-to-train claim, a plaintiff must show: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). Regarding the second prong, a plaintiff most commonly demonstrates a municipality's deliberate indifference by pointing to a failure to act "in response to repeated complaints of constitutional violations by its officers." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020) (quoting *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003)).

*Howell v. NaphCare, Inc.*, 67 F.4th 302, 319 (6th Cir. 2023). "Only in 'rare' circumstances when the need for training is 'patently obvious' will a single constitutional violation suffice to establish that a county acted with deliberate indifference." *Hehrer*, 2025 WL 3564162, at *9 (quoting *Connick*, 563 U.S. at 64). In his response, Plaintiff does not identify any "rare" circumstances that would support liability based on the use of force against him alone.

Nor does Plaintiff point to examples of excessive force used against other pretrial detainees. In the absence of evidence of similar constitutional violations, Plaintiff cannot show a pattern that would have put the Sheriff and the Board on notice that the Defendant Officers' training was inadequate. Likewise, Plaintiff points to no other incidents of a

"failure to supervise" that would have put the County on sufficient notice that its supervision was inadequate. Plaintiff's failure to establish a genuine dispute of material fact concerning the adequacy of the County's training program or its supervision is fatal to his claim. *Howell*, 67 F.4th at 320.

Last but not least, Plaintiff's response wholly fails to address any of Defendants' arguments in favor of summary judgment on Count 5. Apart from the considerable merits of those arguments, Plaintiff's failure to respond amounts to an abandonment of that claim.

### 3. Sheriff Stratton and the Board are Entitled to Summary Judgment on Count 6 - Plaintiff's "Ratification" Claim

Counts 6 asserts "ratification" theories of *Monell* liability based on the Officers' use of force. Under a ratification theory, "municipal liability attaches when a decisionmaker who possesses final authority to establish municipal policy with respect to the action approves the unconstitutional conduct." *Gifford v. Hamilton Cnty.*, No. 24-5893, 2025 WL 1541805 (6th Cir. May 30, 2025). Plaintiff alleges that the Sheriff "had final policy and procedure making authority for the Clermont County Sheriff's Office, its employees, and its agents," which authority was given to the Sheriff "through legislation by Clermont County and the state of Ohio." (Doc. 23, ¶ 83.) He further alleges that the Sheriff and the Board "ratified" the Defendant Officers' use-of-force by failing "to counsel, retrain, discipline, or take any reasonable official action to renounce" the use of force. (*Id.*, ¶ 84.) By way of factual support, Plaintiff points specifically to the post-incident investigation and alleges that the Sheriff and Board exhibited "intentional indifference" which both ratified the Officers' use of force and "served as the motivating force behind the unconstitutional actions and injuries." (*Id.*, ¶ 85.)

In his response in opposition to summary judgment, Plaintiff contends that the RTR report constituted ratification because an unnamed jail administrator signed off on that report:

> [T]he administrator of the Clermont County jail investigated the officers' use of force against Mr. Lovell on February 28, 2021, reviewing the video footage of both incidents and each of the officers' reports. The administrator then issued an "RTR Report," which affirmatively approved the officers' use of force as having been in full compliance with the jail's policies and procedures.

(Doc. 81, PageID 2558; *see also* Doc. 23, ¶¶ 57-58.) Thus, Plaintiff appears to assert that the mere issuance of the RTR report is equivalent to an official Sheriff or Board policy approving the alleged constitutional violations. (Doc. 81, PageID 2557-2558.)

The Court rejects this theory of liability, not least because it is presented for the first time in opposition to summary judgment. Plaintiff points to no evidence that the unidentified administrator is "responsible for establishing final government policy." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482 (1986). In addition, Plaintiff cannot prove that the newly-alleged "policy" of "ratification" was the "moving force" that caused his injuries because all of his claimed injuries occurred *before* any such "ratification." "An action cannot be pursuant to something that has not yet occurred." *David v. City of Bellevue, Ohio*, 706 F. App'x 847, 853 (6th Cir. 2017); *accord Pineda v. Hamilton Cnty, Ohio*, 977 F.3d 483, 496 (6th Cir. 2020) (affirming grant of summary judgment because after-the-fact actions could not cause a prior injury).

Defendants are also entitled to summary judgment on Count 6 based on Plaintiff's failure to produce any evidence of a pattern of force that would establish an unconstitutional policy or custom in this case. *See Pineda*, 977 F.3d at 496; *Thomas*, 398

F.3d at 432-433 (holding that a clear and persistent pattern must be established to show a political subdivision condoned or ratified an unconstitutional action.)

### 4. Summary Judgment is Granted on Count 8, the Failure to Protect Against Unconstitutional Medical Treatment

In Count 8, Plaintiff alleges that Defendant Officers and Nurse Irwin failed to protect him from each other's deliberate indifference to his serious medical needs. He alleges that the officers who "witnessed Nurse Irwin's grossly inadequate and inappropriate response" and "nevertheless locked him in a cell alone for several more hours instead of attempting to ascertain alternative [medical] care" should be held liable for failure to protect and/or for failure to intervene. (Doc. 81, PageID 2557.)

All Defendants are entitled to summary judgment because the same deliberate indifference standard applies to claims that a defendant violated the Fourteenth Amendment by failing to protect a detainee from inadequate medical care. *Lawler*, at 926-927. And, while the Sixth Circuit has left open the question of whether a plaintiff can recover on a failure-to-intervene theory for inadequate medical care separate and apart from a "failure to protect" theory,[32] a plaintiff still must show that there was an "'underlying constitutional violation.'" *See Greene v. Crawford Cnty., Michigan*, 22 F.4th 593, 615 (6th Cir. 2022) (quoting *Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 413 (6th Cir. 2015)). Here, there was no constitutional violation. Therefore, none of the Defendants can be held liable for failing to protect Plaintiff from constitutionally deficient medical care, or for failing to intervene to obtain or to provide more urgent or emergent care.

---

[32]Defendants also would be entitled to qualified immunity on any failure-to-intervene theory relating to medical care that differs from a failure-to-protect claim, because the law supporting a separate constitutional claim was not "clearly established" in February 2021.

**5. SHP, the Sheriff and the Board are Entitled to Summary Judgment on *Monell* Claims Asserted in Counts 9 and 10**

The only two claims asserted against Defendant SHP are Counts 9 and 10, which claims are also asserted against the Defendant Sheriff[33] and the Board. In Count 9, captioned as the "Failure to Supervise Inadequate Medical Care," Plaintiff alleges that all three Defendants acted "under color of state law," when their "subordinates" deprived Plaintiff of his constitutional right to medical care. (*Id.*, ¶¶ 91-92.) Plaintiff generally alleges that SHP, the Sheriff and the Board knew or should have known that the Defendant Officers and Nurse Irwin "posed an unreasonable risk of being objectively, deliberately indifferent to pre-trial detainees' serious medical needs…." (*Id.* ¶ 93.) And he alleges that the three Defendants' failure to "properly supervise, discipline, or train" shows "intentional indifference to the rights of citizens to be free from intentional indifference of inmates' grave medical needs…through their official policy, longstanding practice, and custom." (*Id.*, ¶ 94.)[34] Without further factual support, Plaintiff concludes that the "supervising defendants['] conduct…displayed reckless or intentional indifference," and "was so closely associate[ed] with the [constitutional] deprivation that it was the moving force behind" Plaintiff's injuries. (*Id.*, ¶95.)

In Count 10, Plaintiff alleges that the Sheriff "had final policymaking authority" for the six Defendant Officers and for Nurse Irwin, (*id.*, ¶ 100). Contradictorily, he alleges that Defendant SHP *also* "had final policymaking authority for its employees and agents" including Irwin. (*Id.*, ¶ 101.) Plaintiff further alleges that SHP, the Sheriff and the Board

---

[33]Although Plaintiff does not specify the capacity in which he seeks to hold the Sheriff liable in Count 9 and 10, the Court construes those two claims to be asserted against Sheriff Stratton in his official capacity.
[34]To the extent that Count 9 relies on the conduct of Nurse Irwin as opposed to the Defendant Officers' failure to obtain medical care, Plaintiff offers no evidence that Defendant Sheriff and the Board had any supervisory authority or control over Nurse Irwin, an employee of SHP.

"ratif[ied]" the alleged constitutional violation by Irwin and Defendant Officers by failing to "counsel, retrain, discipline, or take any reasonable official action to renounce the behavior taken." (Doc. 23, ¶ 102.) And Plaintiff asserts that the same three Defendants exhibited "intentional indifference" after the incident(s), which was both a ratification "and served as the motivating force behind the unconstitutional actions and injuries to [Plaintiff]." (*Id*., ¶ 103.)

All Defendants are entitled to summary judgment on these final two claims based on Plaintiff's failure to identify any underlying constitutional violation of Plaintiff's right to medical care by Irwin or the Defendant Officers. Even if he could prove a constitutional violation, Plaintiff's claims still fail because he offers no evidence to suggest that any specific policy promulgated by SHP, the Sheriff, or Clermont County was the "moving force" that was responsible for his medical injuries. *See, generally, Kimbrough v. Core Civic*, 2019 WL 2501558, at *3 (dismissing pro se prisoner complaint on initial screen under 28 U.S.C. § 1915(e)(2)(B) because "an allegation that Core Civic had a duty to hire and train competent staff is insufficient to identify a Core Civic policy and tie that policy to Plaintiff's injury." (internal citations omitted)). Nor does Plaintiff cite to any evidence at all to support his ratification theory under Count 10.[35]

Last, and consistent with his failure to respond to the Sheriff and Board's arguments on Count 5, Plaintiff fails to respond to the arguments of the Sheriff and the Board on Count 9 or to SHP's persuasive arguments on both Counts 9 and 10. For that

---

[35]Plaintiff cites to the RTR report to support ratification of the use-of-force, but not to evidence to support ratification of his medical treatment.

reason, Plaintiff is deemed to have abandoned the *Monell* claim asserted in Count 9 against the Sheriff and the Board[36] as well as both *Monell* claims against SHP.

### V. Conclusion and Order

For the reasons discussed, **IT IS ORDERED THAT**:

1. The motion of the County Defendants (Doc. 58) is DENIED in part and GRANTED in part as follows:

   a. The motion is GRANTED for the excessive force claim asserted against Defendant Shouse in Count 1, as well as for the excessive force claim asserted against Defendant Tincher in Count 2;

   b. The motion as to the excessive force claims asserted against the remaining Defendant Officers in Counts 1 and 2 is DENIED;

   c. The County Defendants' motion for summary judgment on Counts 3-10 is GRANTED;

2. The separate motion of Defendants Nurse Irwin and SHP for summary judgment (Doc. 57) is GRANTED in full, with all claims against those two Defendants to be dismissed;

3. This case will proceed to trial on the excessive force claims that remain.

*s/Stephanie K. Bowman*
Stephanie K. Bowman
United States Chief Magistrate Judge

---

[36]Plaintiff's response in opposition to summary judgment on all *Monell* claims limits argument to Count 6, which asserts a "ratification" theory against the Sheriff and the Board based on the issuance of the post-incident RTR report by a Jail Administrator.